BELL, Admr., Appellant,

v.

MT. SINAI MEDICAL CENTER et al., Appellees.

[Cite as *Bell v. Mt. Sinai Med. Ctr.* (1994), 95 Ohio App.3d 590.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63424.

Decided June 13, 1994.

*Charles Kampinski Co., L.P.A.,* and *Charles Kampinski,* for appellant.

*Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., John V. Jackson II, Janis L. Small, Steven J. Hupp* and *Craig A. Grimes,* for appellees.

HARPER, Presiding Judge.

Plaintiff-appellant, James A. Bell, Administrator of the Estate of Vivian Bell, instituted this wrongful death action in the Court of Common Pleas of Cuyahoga County on March 31, 1989. Mt. Sinai Medical Center ("Mt. Sinai"), Thomas Santoscoy, M.D., and Terry King, M.D., were named as defendants. Appellant alleged that Drs. Santoscoy and King performed negligently during Mrs. Bell's coronary bypass surgery at Mt. Sinai, and thereby proximately caused her death.

The case proceeded to trial on March 5, 1991, and the jury began deliberations on March 14, 1991. On March 19, 1991, the jury found in favor of Drs. Santoscoy and King, but was unable to enter a verdict with regard to Mt. Sinai's liability. The trial court, therefore, entered verdicts in favor of the physicians based upon interrogatory answers, and ordered a new trial on appellant's claims against Mt. Sinai.

Appellant filed a motion for judgment notwithstanding the verdict or in the alternative for new trial. The trial court overruled the motion on May 9, 1991.

Appellant filed a notice of appeal in this court on May 23, 1991 from the verdicts rendered in favor of defendants-appellees, Drs. Santoscoy and King. We dismissed the appeal pursuant to Civ.R. 54(B) on July 19, 1991.

The new trial on appellant's claims against Mt. Sinai commenced on November 18, 1991. The jury rendered a verdict in favor of appellant and against Mt. Sinai in the amount of $3,078,000 on November 27, 1991. The trial court denied Mt. Sinai's motions for new trial and/or a remittitur on February 20, 1992.

Mt. Sinai appealed from the verdict rendered against it on March 10, 1992.[1] Appellant filed a second notice of appeal from the verdicts rendered in favor of Drs. King and Santoscoy on March 18, 1992, the present appeal.[2]

I

Mrs. Bell, on September 28, 1987, underwent coronary artery bypass graft ("CABG") surgery at Mt. Sinai. She was sixty-nine years old. Mrs. Bell's attending physician and surgeon was Dr. Santoscoy, a board-certified cardiothoracic surgeon. Dr. Santoscoy routinely had a resident in the operating room at Mt. Sinai during the performance of heart surgery. Dr. Scott Comp, a fifth year general surgery resident, assisted in Mrs. Bell's surgery.

Dr. Comp initiated the surgery by performing a median sternotomy, the operative procedure to open the chest. Residents at Mt. Sinai routinely performed this procedure. After Dr. Comp opened the skin down to the sternum, he used an electric Bovie cauterization device to divide the sternal ligament which lies under the sternum. Dr. Comp burned a hole in Mrs. Bell's innominate artery while performing the procedure. The innominate artery provides blood to the brain, head, neck and face.

Dr. Santoscoy testified that he was trained to use electric cautery to divide the sternal ligament during the sternotomy. Moreover, Dr. John Kratz, an expert witness for Dr. Santoscoy who is a cardiac surgeon at the Medical University of South Carolina, testified that he trains residents to divide the sternal ligament with electric cautery. He testified further that 99.9 percent of all heart surgeons conceive the use of the electric cautery as the proper way to divide the ligament.

---

1. This appeal, App. No. 63386, was dismissed with prejudice by agreement of counsel on October 9, 1992.

2. See, also, App. Nos. 63061, 61843, 63230.

According to Dr. Comp and Dr. Santoscoy, the Bovie cautery was correctly placed at the sternal notch during Mrs. Bell's surgery. However, only minutes into the surgery, significant bleeding developed, arising from the sternal notch. Drs. Santoscoy and Comp first applied digital compression in order to find the source of the bleeding in an area above the suprasternal notch. Dr. Santoscoy next attempted to repair a hole discovered in the innominate artery with sutures. One-half hour after the surgery began, the bleeding and Mrs. Bell's blood pressure were under control. Dr. Santoscoy nonetheless found that repairing the innominate artery was not easy; Mrs. Bell was, therefore, placed on bypass[3] at approximately 9:51 a.m. The repair was purportedly completed, and Dr. Santoscoy proceeded with the heart surgery at about 11:00 a.m.

Mrs. Bell was taken off bypass and Dr. Santoscoy observed that the innominate artery was oozing blood and appeared stenotic or obstructed. He called in Dr. King, a board-certified vascular surgeon.

Dr. Santoscoy and Dr. King decided that the best method to repair Mrs. Bell's innominate artery was to use a patch on the artery. They used a partial occluding clamp to close off the artery to effectuate the repair. Dr. Santoscoy and Dr. Comp continued with the heart surgery after the repair.

Mrs. Bell was taken to the recovery room and her blood pressure was stable. Dr. Santoscoy inspected her eyes and found the right eye to be large and fixed. He related to Mrs. Bell's family that she suffered a stroke as a result of the surgery. Mrs. Bell never regained consciousness and she died on October 6, 1987.

Appellant presented Dr. Sheldon Burman, a board-certified cardiothoracic surgeon from Chicago, as his expert witness. Dr. Burman testified that burning a hole in the innominate artery amounted to a failure to adhere to acceptable standards of care on behalf of Mt. Sinai and Drs. Santoscoy and King through the actions of Dr. Comp. This failure to adhere to acceptable standards contributed to Mrs. Bell's death. Dr. Burman was also critical of Dr. Santoscoy's initial suture repair attempts without placing Mrs. Bell on bypass. With regard to the clamping of the innominate artery during the patch repair, he opined that the artery should not have been totally occluded; rather, a shunt[4] should have been used to preserve circulation. Since Mrs. Bell's artery was clamped, her brain was deprived of blood and oxygen, according to the doctor.

---

3. A bypass machine allows for a large cannula or hose to divert blood from the heart, oxygenate it, and then send it back to the aorta. The heart and lungs are bypassed and the blood flow is not pulsatile.

4. A shunt is a piece of plastic tubing which is inserted in the artery of either side of the repair site to allow the blood supply to be maintained, but directed away from the area.

At the time of trial, Dr. Burman, however, had not performed either a median sternotomy or any cardiothoracic surgery in ten years. His area of practice was currently limited to penile revascularization. Additionally, Dr. Burman never performed an innominate artery repair.

John Hower, M.D., a vascular surgeon, and John Kratz, M.D., a cardiothoracic surgeon, were called as expert witnesses for the defense. Both testified that the innominate artery was abnormally positioned in Mrs. Bell. Specifically, Dr. Kratz testified that in patients who suffer from cardiovascular disease and have had longstanding hypertension, such as Mrs. Bell, arteries may become elongated and buckle as a result of these conditions. In this case, Mrs. Bell's artery buckled underneath her sternum, and according to Drs. Hower and Kratz, its position led to the injury. Dr. Hower, therefore, testified that Dr. Comp met acceptable standards of care in performing the sternotomy, and Dr. Kratz testified that all of the physicians involved in the surgery met accepted standards of care.

Dr. Norman Hertzer, a board-certified surgeon, joined in the opinion that Mrs. Bell's innominate artery was abnormally placed, while testifying as an expert witness for Dr. King. Regarding the repair procedure, Dr. Hertz testified that no major medical center in the United States uses shunts to repair the innominate artery, in contrast to Dr. Burman's opinion. Dr. Hertzer testified further that he always uses clamps when conducting reconstructive surgery on the innominate artery, and that none of his patients ever suffered strokes as a result thereof. Finally, Dr. Hertzer testified that the clamping of the innominate artery by Dr. King did not totally cut off the blood supply to Mrs. Bell's brain because there are additional circulation routes to the area of the brain supplied with blood through the innominate artery. Dr. Hertzer, therefore, opined that Dr. King clearly met acceptable standards of care.

The issue of Dr. King's and Dr. Santoscoy's negligence in their supervision of Dr. Comp was then given to the jury for determination. After some incidents involving the jury, incidents which are the subject of appellant's second and third assignments of error and will be discussed *infra*, the jury returned verdicts in favor of both doctors.

## II

Appellant appeals from the jury's verdict and the trial court's ruling on his post-trial motions. He asserts that the trial court erred in the following respects:

"I. The trial court erred in not granting a new trial against Dr. Santoscoy.

"II. The trial court erred in not granting a new trial based on appellees' counsel's misconduct in violating the sanctity of jury deliberations and not disclosing the violation to the court.

"III. The trial court erred in overruling appellant's motion for new trial based on the misconduct and irregularities occurring during the jury deliberations.

"IV. Counsel for Dr. King's gross misconduct during his closing argument warrants a new trial."

## III

For his first assignment of error, appellant submits that the trial court erred in not granting a new trial against Dr. Santoscoy. Specifically, appellant avers that Dr. Santoscoy was responsible for the actions of Dr. Comp, a resident who performed a surgical procedure on Mrs. Bell. He relies on *Baird v. Sickler* (1982), 69 Ohio St.2d 652, 23 O.O.3d 532, 433 N.E.2d 593, in claiming that if the jury found Dr. Comp negligent, it must also find Dr. Santoscoy negligent.

After the trial court completed its charge to the jury, the jury submitted the following question to the court: "If Dr. Comp is found to have deviated from standard of care do we necessarily find Dr. Santoscoy deviated from standard of care as well?" [5] The trial court answered in the negative. Appellant thus also finds fault with the trial court's instruction to the jury with regard to Dr. Santoscoy's relationship to Dr. Comp's actions, and submits that the error in the instruction warrants a new trial. In other words, appellant maintains that the trial court should have instructed the jury that "if it found the resident negligent, it must also find Dr. Santoscoy negligent."

A trial court is afforded wide discretion in determining the propriety of a new trial. See *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19; *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 21 O.O.3d 198, 423 N.E.2d 856; *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, 262 N.E.2d 685; *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976. An order which denies a new trial will, therefore, be reversed only upon a showing of an abuse of discretion. *Rohde,* paragraph one of the syllabus. The term "abuse of discretion" connotes more that an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary or unconscionable. *Id.,* 23 Ohio St.2d at 87, 52 O.O.2d at 378–379, 262 N.E.2d at 688–689.

The trial court instructed the jury as follows with regard to Dr. Santoscoy's responsibility for Dr. Comp's actions:

---

**5.** The question submitted to the court also concluded with a crossed-out portion which reads, "in light of Dr. Santoscoy having supervisory responsibility over Dr. Comp."

"A surgeon is responsible for the acts of a resident under the surgeon's employ, or when the surgeon has the right to control the performance of that resident's services and the right to direct the manner in which those services will be performed. The negligence of such resident, thus, is negligence of such surgeon. *If you find by greater weight of the evidence that Dr. Scott Comp was negligent, then you may find that Dr. Santoscoy was negligent.*" (Emphasis added.)

Initially, we note that appellant did not object to this instruction as given by the trial court. Nor did appellant react to the trial court's negative response to the jury's question.

■ Civ.R. 51(A) precludes a party from assigning as error any deficiency or misstatement in the charge to the jury unless the party objects to the charge prior to the jury's retiring for deliberations and states the grounds for the objection. Generally, if the party does not object and state the grounds for the objection, the objection is waived on appeal. See *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001; see, also, *R.H. Macy & Co. v. Otis Elevator Co.* (1990), 51 Ohio St.3d 108, 554 N.E.2d 1313.

Additionally, the trial court's instruction to the jury was an accurate statement of the law. See 3 Ohio Jury Instructions (1993), Section 331.06(1). In light of this accuracy, and the presumption that the jury follows the instructions given to it by the court, *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus (*State v. Fox* [1938], 133 Ohio St. 154, 10 O.O. 218, 12 N.E.2d 413; *Browning v. State* [1929], 120 Ohio St. 62, 165 N.E. 566, approved and followed), this court finds that the trial court properly denied appellant's motion for new trial against Dr. Santoscoy. See, also, *Berlinger v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 830, 589 N.E.2d 1378.

Appellant's first assignment of error is overruled.

### IV

■ Appellant, in his second assignment of error, submits that irregularities occurred during the deliberations of the jury. He argues that the trial court erred in denying his motion for mistrial based upon appellees' counsel's alleged violation of three Disciplinary Rules of the Code of Professional Responsibility, DR 7–108(G); DR 7–102(A)(3), and DR 1–102(A)(4) and (5).[6]

---

6. These rules provide, in relevant part, respectively:
   DR 7–108(G):
   "A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer has knowledge."
   DR 7–102(A)(3):

One · of the jurors telephoned Dr. David Rollins, a vascular surgeon at St. Vincent Charity Hospital, on the evening of the third day of deliberations in order to seek guidance on the issues in the case. The juror also communicated to Dr. Rollins that the jury was going to find in favor of Dr. King, and she was the swing vote with regard to Drs. Santoscoy and Comp.

Dr. Rollins relayed the information received from the juror to Robert Maynard, a senior partner at the law firm which represented Drs. Santoscoy and King and, at ·the time, the Chairman of the Board of St. Vincent Charity Hospital. Dr. Rollins contacted Maynard because the two of them had recently discussed the present case. Maynard in turn contacted John Jackson (counsel for Dr. King), the trial court, and then Stephen Charms (Dr. Santoscoy's counsel).

The trial court, armed with this information, entered into an investigation of the juror's alleged misconduct by first discussing the situation with all counsel. The second step was to identify the juror by questioning the jurors about their knowledge of the telephone call. The jurors were also questioned concerning their knowledge of the contents of the purported conversation. The field of jurors suspected of making the call was reduced, and the court thereafter spoke with the jury foreman. This conversation led to the identification of the juror who had made the telephone call.

The trial court stated as follows as to what it believed would be the appropriate action to take under the circumstances: ·

" * * * I discussed with counsel, and it's my understanding now that *all the attorneys agree, that [the juror's] discussions had not yet infected any of the other jurors.* So that the deliberations could proceed.

"It's my understanding that all counsel agree. they will proceed with seven jurors, that we will excuse [the juror] from the further deliberations in this case, * * * and proceeding with the seven remaining jurors and the verdict may be arrived at by a vote of any six of the seven." (Emphasis added.)

Though Maynard informed the court about the juror's contact with Dr. Rollins, he initially stated that he may have informed Jackson, and maybe Charms, of the jury's vote with regard to Dr. King. Maynard later related to the court that he remembered that he made a conscious decision not to tell Jackson and Charms

---

"In his representation of a client, a lawyer shall not:
" * * *
"(3) conceal or knowingly fail to disclose that which he is required by law to reveal."
DR 1–102(A)(4), (5):
"(A) A lawyer shall not:
" * * *
"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
"(5) Engage in conduct that is prejudicial to the administration of justice."

about the Dr. King verdict. There is no dispute that at no time did he advise appellant's counsel, Charles Kampinski, that the juror revealed to Dr. Rollins the vote in favor of Dr. King. It was only after all counsel agreed to the dismissal of the juror that appellant's counsel, Kampinski, became aware of the possibility that Maynard may have communicated the Dr. King verdict to defense counsel. Appellant's counsel, therefore, addressed the court as follows:

"When we were here this morning and this revelation was made we were specifically told that there was no knowledge on the part of the attorneys as to what the jury's determination had been as to any defendant. That's obviously just absolutely not the case.

"Therefore, I was in a position of not having knowledge that the defense attorneys had this morning and this entire argument that they made about me having waived of proceeding with seven jurors, even if that argument has any degree of reliability as it relates to what might ultimately be done, it can have no reliability based on the fact that I didn't have the information that they had when I was asked to make this decision.

"Absent having been told what we have just now been told, and this is that these attorneys knew, I mean they knew what was going on in this jury room. They didn't tell the Court, they didn't tell me, and to have allowed this then to go back to them for deliberations when they were aware of what was happening in there, something I've been strenuously talking about for the last two days, that had been my suspicion and now the suspicion is confirmed, *I would suggest to this Court that plaintiffs are entitled to a mistrial, your Honor, right now without really any further dispute.*" (Emphasis added.)

The trial court subsequently denied the motion for mistrial, but advised appellant's counsel that it would entertain a motion for either judgment notwithstanding the verdict or new trial after the jury's verdict. The reason given for the denial of the mistrial motion was that the trial court believed a mistrial would be the worst possible solution, since there was no indication that any prejudice resulted from the withholding of the information. Finally, the trial court expressed its opinion that the jury's decision should be known prior to any action, and if there appeared to be a problem with the decision, it could be remedied afterwards. Appellant proposes, "by denying Appellant the right to withdraw his consent to proceed with [less than] eight jurors prior to verdict and by failing to order a mistrial once this information was discovered or new trial post-verdict, the Trial Court allowed counsel to profit from their unethical conduct."

As stated *supra,* a trial court is vested with wide discretion when confronted with a motion for new trial. See *Osler; Jenkins; Rohde; Verbon.* Absent an abuse of that discretion, a reviewing court should not reverse the trial court's ruling. See *Rohde.*

In the present case, the trial court was quickly notified of the juror's communication with Dr. Rollins by defense counsel's law firm partner, Maynard. Though Maynard originally thought he might have told Jackson and Charms about the jury's stance as to Dr. King, he later informed the court that he was mistaken. Maynard also provided the trial court with an affidavit in which he repeated that he kept this information to himself. The trial court consequently denied appellant's motion for new trial based upon its conclusion that there was no attorney misconduct in this case. This court finds no abuse of discretion in this decision.

Appellant's second assignment of error is overruled.

V

■ Appellant, for his third assignment of error, proposes that in addition to the juror's misconduct relating to the telephone call to St. Vincent Charity Hospital, other irregularities occurring during the jury deliberations warranted a new trial. Specifically, appellant suggests that individual jurors used dictionaries to help them understand certain terms, including "misadventure" and "malpractice." He argues, therefore, that the trial court erred in not ordering a new trial based on a combination of this misconduct.

As stated *supra*, a trial court is vested with discretion when ruling on a party's motion for new trial. See *Osler; Jenkins; Rohde; Verbon.* Absent an abuse of that discretion, a reviewing court will not reverse the ruling. See *Rohde.*

In *State v. Kehn* (1977), 50 Ohio St.2d 11, 4 O.O.3d 74, 361 N.E.2d 1330, the Supreme Court of Ohio recognized that "[i]t is a long-standing rule of this court that we will not reverse a judgment because of the misconduct of a juror unless prejudice to the complaining party is shown." *Id.* at 19, 4 O.O.3d at 78, 361 N.E.2d at 1335, citing *Armleder v. Lieberman* (1877), 33 Ohio St. 77. See, also, *State v. Hipkins* (1982), 69 Ohio St.2d 80, 23 O.O.3d 123, 430 N.E.2d 943; *State v. Lewis* (Sept. 26, 1991), Cuyahoga App. No. 59535, unreported. Moreover, a jury is presumed to follow the instructions as given by the trial court. *Pang; Berlinger.*

Initially, the record reveals that appellant's counsel became aware of the use of dictionaries when the trial court questioned the jurors about their knowledge of the telephone call to Dr. Rollins. Appellant's counsel was aware of the use of the dictionaries even when he stipulated to a jury containing less than eight members. Counsel did not object to the jury's ensuing continued deliberations, voiced no comment after the jury's verdict even when allowed to question the jurors in light of the preceding irregularities,[7] and did not address the alleged prejudicial

---

7. Appellant's counsel only asked a juror about having a relative at Mt. Sinai.

impact of dictionary usage until the filing of appellant's motion for a new trial. Appellant thus waives this issue on appeal. See *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 512 N.E.2d 640.

Assuming *arguendo* there was an objection, the jurors admitted to the trial court and counsel that jurors took it upon themselves to look up terms in a dictionary, but appellant fails to demonstrate prejudice resulting from the action. First, the jurors responded that the dictionary definitions did not affect their decisions when questioned by the court. Second, appellant did not provide the definitions used by the jurors and now provides to this court definitions from a common dictionary, but we have no way of knowing that these provided definitions were the ones used by the jurors. This court cannot compare these definitions to the terms defined by the court in its charge to determine the existence of prejudice. Appellant, therefore, has failed to demonstrate prejudice stemming from the use of dictionaries by members of the jury, and is, therefore, undeserving of a new trial based on this alleged jury misconduct. See *State v. Fleming* (Aug. 2, 1991), Erie App. No. E–90–16, unreported, 1991 WL 355204; *Cameron v. Alba Ski & Sport Hut, Inc.* (Aug. 7, 1986), Franklin App. No. 85AP–1018, unreported, 1986 WL 8673.

Regarding the juror's telephone call to Dr. Rollins, there is *no doubt* such action amounted to misconduct. However, the record contradicts appellant's position that the call influenced the jury's deliberations. First, appellant's counsel agreed to excuse the juror after finding out about the call, and to continuing with a jury consisting of seven members. Second, the trial court stated that *all counsel* agreed that the telephone call did not "infect" the remaining members of the jury. Therefore, appellant's argument that the telephone call amounted to prejudicial juror misconduct which warrants a new trial is disputed by the record.

Appellant's third assignment of error is overruled.

## VI

■ Appellant primarily submits in his fourth assignment of error that a new trial was warranted in light of Jackson's "gross misconduct" during his closing argument. Appellant asserts that defense counsel "impugned the integrity of Appellant's expert, Dr. Burman, and launched a caustic and vicious attack on Plaintiff's counsel," thereby inflaming the jury and denying him a fair trial.

Appellant cites the following passage of Jackson's closing statement in support of his argument:

" * * * Mr. Monteleone reviewed the records and talked with experts and apparently Mr. Monteleone felt—

"MR. KAMPINSKI: Objection.

"THE COURT: I'll sustain it.

"MR. KAMPINSKI: Objection. [*Sic.*]

"MR. JACKSON: Apparently he doesn't represent this man anymore.

"MR. KAMPINSKI: Objection.

"THE COURT: Overruled.

" * * *

"Campaign with this and all the numbers, well, he is trying to sell you something. He wants you to buy this theory. Well, the first lawyer didn't buy it and we don't know how many others didn't. And he found a lawyer that would come in and sell it for you.

"MR. KAMPINSKI: Objection.

"THE COURT: Overruled."

Appellant does cite additional comments made by Jackson and to comments made by Dr. Santoscoy's counsel, Charms, in support of his argument, but counsel did not object to these comments. A failure to object to an error during the course of trial so as to allow the trial court to act on the alleged error prior to the retirement of the jury is a waiver of that error on appeal. *LeFort; Schade.* Further, this court is precluded from considering appellant's statement, "all defense counsel uttered remarks directed either at Plaintiff's counsel, or commented on the evidence, rather than stating objections," since this general statement fails to refer to the record. See App.R. 12(A)(2), 16(A)(7). We will, therefore, only consider the passage quoted above as grounds for reversal in this assignment of error.

Trial counsel is generally accorded considerable latitude in closing argument. *Pang,* paragraph two of the syllabus; *Durst v. Van Gundy* (1982), 8 Ohio App.3d 72, 8 OBR 103, 455 N.E.2d 1319. The trial court's control over the latitude allowed is discretionary. The action of the trial court will not be disturbed absent an abuse of discretion. *Kubiszak v. Rini's Supermarket* (1991), 77 Ohio App.3d 679, 688, 603 N.E.2d 308, 314; *Hitson v. Cleveland* (Dec. 13, 1990), Cuyahoga App. No. 57741, unreported, 1990 WL 204337; *Waddell v. Fisher Foods, Inc.* (Apr. 4, 1985), Cuyahoga App. No. 48895, unreported, 1985 WL 7939. Only if the circumstances are of such a reprehensible and heinous nature as to constitute prejudice, will this court reverse a judgment based upon closing argument. *Kubiszak; Hitson; Plavcan v. Longo* (July 3, 1980), Cuyahoga App. No. 39964, unreported.

In the within case, we do not characterize any of Jackson's statements as reprehensible or heinous and, consequently, do not find any prejudicial misconduct during counsel's closing argument. Even when we consider the other comments not objected to by appellant's counsel during Jackson's and Charms's closing argument, we fail to find the presence of improper statements which were so reprehensible and heinous as to constitute prejudice.

Appellant's fourth assignment of error is overruled.

*Judgment affirmed.*

NUGENT and DYKE, JJ., concur.