[Cite as *Allen v. Jackson*, 2014-Ohio-5793.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 101193

---

**JANET J. ALLEN**

PLAINTIFF-APPELLANT

vs.

**ANDREW JACKSON**

DEFENDANT-APPELLEE

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-800771

**BEFORE:** Jones, P.J., E.A. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** December 31, 2014

**ATTORNEYS FOR APPELLANT**

Gerald R. Walton
John J. Schneider
Gerald R. Walton & Associates
2800 Euclid Avenue
Suite 320
Cleveland, Ohio 44115


**ATTORNEYS FOR APPELLEE**

Milton D. Jefferson
11502 Nelson Avenue
Cleveland, Ohio 44105

Joseph W. Jasper, Jr.
614 West Superior Avenue
Suite 940
Cleveland, Ohio 44113

LARRY A. JONES, SR., P.J.:

**{¶1}** This case involves car repairs made to plaintiff-appellant Janet Allen's 2001 Ford Focus by AJ Automotive, which is owned by defendant-appellee, Andrew Jackson. A jury found in favor of Jackson and Allen has appealed.

## Procedural History and Facts

**{¶2}** In February 2013, Allen sued Jackson, alleging breach of contract, negligence, fraud, and a violation of the Ohio Consumer Sales Practices Act. Jackson moved for summary judgment, which the trial court denied. Allen submitted an expert report from Dean Stecker, the mechanic who examined her car after she had it towed to his repair shop. Allen also filed a motion in limine to preclude any expert testimony from defense witnesses because Jackson had not submitted an expert report. The court granted the motion in limine and the matter proceeded to a jury trial at which the following pertinent evidence was presented.

**{¶3}** In 2006, Allen purchased a used Ford Focus with over 42,000 miles on it. She began experiencing problems with the car's engine in the summer of 2009. Allen's uncle tried to fix the car, but was unable to. Allen had her car towed to AJ Automotive on Carnegie Avenue in Cleveland for repairs. At this time, the car had 81,765 miles on it. Allen's mother handled all the conversations with AJ Automotive and paid the invoices. Allen's mother surmised that the engine needed to be rebuilt and she told AJ Automotive that her budget did not allow for a brand new engine.

**{¶4}** The Ford was at AJ Automotive for repairs from September 24, 2009 until October 26, 2009. Keith Dillard, AJ Automotive's service manager, testified that when Allen's car was first towed to the repair shop, the top portion of the motor was disassembled. Once their mechanic reassembled the motor, they discovered more needed to be done to fix the car. Dillard faxed multiple estimates to Allen's mother and the final estimate was $1,816.70.

{¶5} Chad Padgett, the mechanic at AJ Automotive who installed the engine and did the other repairs to the car, testified that when Allen initially brought the car in, the engine was "half tore apart." Padgett testified that a subcontractor from Clark Automotive worked on the Ford's engine, but he personally inspected the engine to make sure everything was in working order before he reinstalled it.

{¶6} Allen picked her car up on October 26, 2009, but brought it back about a week later, on November 3, complaining of leaking antifreeze. At this time, the car had 82,084 miles on it. Padgett installed a new overflow bottle and replaced the overflow cap. Padgett testified that the car was not overheating when he replaced the overflow bottle; he pressure-checked everything and it checked out okay.

{¶7} Allen picked her car up November 6 but had it towed back to the shop on November 9 claiming it was overheating. Dillard testified that the coolant fan, radiator, and thermostat needed to be replaced. Padgett admitted that it was unusual for a radiator "and all that stuff" to go bad in three days' time but "we're dealing with old cars," "bumps," and "living in Cleveland." The invoice for the repairs totaled $501.80.

{¶8} Allen returned to AJ Automotive on December 15, 2009 because her car "still wasn't running right." The shop replaced the dipstick tube. The cost to install a new oil dipstick tube and seal was $137.55. The car had 83,226 miles on it.

{¶9} In January 2010, Allen had her car towed to AJ Automotive complaining that the "engine was knocking." According to Dillard, Allen's mother said she was not going to put any more money into the car but expected it to be repaired. Dillard told her mother that they would inspect the car to see what was wrong with it and whether any necessary repairs would be covered by her warranty. But, Dillard told Allen's mother, if there were repairs that were not covered by

warranty, she would be charged for them.

{¶10} Allen's mother consulted with her attorney and had the car towed to DAD's Automotive. Dillard testified that AJ Automotive did not inspect the car at the January 2010 visit.

{¶11} Dean Stecker, owner of DAD's Automotive and a master mechanic, testified that Allen's car was towed to his shop for a second opinion. The car sat on his outdoor, unsecure lot for a couple of months until he inspected it, due in part to a lack of communication by Allen's mother.

{¶12} According to Stecker, one of the pistons was missing from its cylinder, so the car was running on three cylinders instead of four. Stecker located the missing piston in the trunk of Allen's car; the piston was destroyed. According to Stecker, someone must have physically removed the piston and to do so "is a big job." Stecker testified that it was possible to drive a four-cylinder car on only three cylinders, but the operator would probably feel the engine shake and "miss," and anyone driving the car with a missing piston would definitely know something was wrong with the car.

{¶13} Stecker reviewed the invoices from AJ Automotive and opined that Allen had been charged for a head gasket that had never been replaced; the car still needed a new head gasket when he inspected it. He also opined that Allen's car had signs that it had been overheating for some time.

{¶14} Stecker testified that "the engine had a problem and was never repaired correctly because the pressure of that piston coming up into the cooling system would have caused the coolant reservoir to go bad, would cause the radiator to go bad due to pressure."

{¶15} Stecker admitted that Allen's car sat on his unsecured lot for more than two months

before he inspected it. When he began to work on the car, he noticed that the starter wires were unconnected, which meant that the car was inoperable.

{¶16} DAD's automotive charged Allen's mother $210 for repair work that included installing the starter wires, removing the cylinder head, as well as the diagnostic work involved in determining that the piston had been removed. Allen did not want to pay to have the car repaired and sold it for parts for $250.

{¶17} Padgett testified that all four pistons were in the vehicle when he performed the engine work on the car in September and October 2009: "I went over the motor myself personally, all the pistons were in the vehicle. If the piston was not in the vehicle, [it] would not run. * * * The engine would smoke, smoke would come out the exhaust if a piston was missing out of the engine." On cross-examination, Padgett was asked how he would know whether Clark Automotive, that had worked on the engine for AJ Automotive, had correctly installed all new pistons in Allen's car. Padgett responded:

> I visually inspected it and I see everything that is new that is in the car or I would make a complaint. * * * I cannot visibly see the [cylinder] rings without me disassembling the motor. You can see the new pistons, you can see the new rods. You can see that.

{¶18} Padgett insisted the subcontractor from Clark Automotive installed the new pistons. Padgett further testified, "If you're saying that on 10/26 that the vehicle was released missing a piston, I'm pretty sure on 10/27 the customer would be back complaining about a missing piston." Padgett also insisted that he personally installed the new head gasket on the car and that both he and Dillard road tested the vehicle after the engine work was complete and before it was released to Allen in October 2009, and the car was running fine.

{¶19} Dillard testified that after the initial repairs to the engine were made, and up until January 2010, Allen returned to the repair shop with "non-engine related complaints." Dillard

testified "[y]ou can't determine normal wear and tear [and] when something's going to go out on a used vehicle. All I can go on is what was properly functioning fine when it left our care." Dillard insisted he road tested the car with Allen before she drove it home. Allen, on the other hand, testified that she never took a test ride in the car with anyone from AJ Automotive.

{¶20} Jackson testified that he owned AJ Automotive and reviewed Allen's invoices personally and with Dillard and Padgett. Jackson testified they did the repairs at a "low, low cost" because he (Jackson) knew Allen's mother was on a budget. He remembered going over the first two invoices with Allen's mother in his office sometime in November 2009 and Allen's mother agreed that the work needed to be done.

{¶21} Jackson testified that he agreed to accept a partial payment on the third invoice and allow Allen's mother to pay it off over time:

> Prior to her doing any work on [November] 9th * * * she [Allen's mother] told me that she had spent too much money already on this car on these two invoices * * * we had a discussion about whether or not she could afford the radiator work and all that. At that point I agreed with Ms. Allen, I understood and [said] I want to work with you, I know that this is expensive for you and I'm willing to * * * let [you] make a down payment.

{¶22} The jury found in favor of Jackson and AJ Automotive. Allen moved for a judgment nothwithstanding the verdict and for a new trial, which the trial court denied.

{¶23} Allen filed a timely appeal.

### Assignments of Error

I. Defendant invited error by attempting to elicit expert testimony that had been previously precluded.

II. Defendant invited error by arguing facts not in evidence.

III. The trial court erred in that the judgment of the court is an abuse of discretion and contrary to the manifest weight of the evidence.

### Law and Analysis

{¶24} In the first and second assignments of error, Allen claims that defense counsel acted inappropriately when the attorney elicited improper opinion testimony from AJ Automotive's mechanic in contravention of the motion in limine and by making statements during closing argument that were not part of the evidence presented at trial.

{¶25} First, Allen claims that defense counsel erred when he questioned Padgett about the missing piston and then asked him about a photograph of the car that had been offered into evidence. We disagree.

{¶26} During his direct examination, counsel asked Padgett what would happen if there was a piston missing from the vehicle. Padgett responded that the engine would smoke, oil would come out, there would be a fire in the motor, and "it would be disastrous." Allen's attorney then objected and the trial court sustained the objection.

{¶27} We do not find that defense counsel's question was offered as a way to elicit improper opinion or expert testimony. Padgett was not offered as an expert nor did defense counsel inquire of Padgett about his expertise in the field of automotive mechanics. Plaintiff's theory was that AJ Automotive performed substandard work or installed substandard parts on Allen's car. To refute that theory, counsel was questioning Padgett about the work he performed on Allen's car, and the mechanic was explaining how a car with a missing piston could not run properly; thereby, supporting the defense's theory that AJ Automotive was not liable for the condition of Allen's car.

{¶28} Defense counsel then inquired about a photograph that Allen had offered into evidence, but Padgett did not reply before Allen's attorney requested a sidebar. After the sidebar, defense counsel ended his direct examination of Padgett and no further questions were asked about the photograph.

**{¶29}** Even if Padgett's response to defense counsel's line of questioning was improper, the trial court sustained Allen's objection to defense counsel's question and later instructed the jury as follows:

> Evidence Stricken. Questions to which the Court sustained an objection or statements or answers ordered stricken which you were instructed to disregard are not evidence and must be treated as though these were never heard.

> Objections and Speculation. You must not guess why the Court sustained an objection to any question or what the answer to such a question might have been. You must not consider as evidence any suggestion included in a question that was not answered.

**{¶30}** A jury is presumed to follow instructions issued by the trial court. *Bell v. Mt. Sinai Med. Ctr.*, 95 Ohio App.3d 590, 599, 643 N.E.2d 151 (8th Dist.1994). Absent more, we will presume the jury did so in this case.

**{¶31}** Allen also claims that defense counsel made inappropriate remarks in closing arguments by telling the jury someone other than AJ Automotive must have tampered with or tried to fix Allen's car. But defense counsel was making references to testimony introduced at trial with inferences drawn from that testimony. As an advocate for his client, defense counsel was setting forth a theory for the jury to explain how Allen's car might have ended up as it did absent his client being liable for its condition.

**{¶32}** Trial counsel is generally accorded considerable latitude in closing argument. *Durst v. Van Gundy*, 8 Ohio App.3d 72, 455 N.E.2d 1319 (10th Dist.1982). "A [party] may freely comment in closing argument on what the evidence has shown and what reasonable inferences the [party] believes may be drawn therefrom." *Peffer v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, ¶ 27, citing *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 47 (8th Dist.). Opening and closing statements are also not evidence. *Peffer* at *id.*, citing *State v. Spaqi*, 8th Dist. Cuyahoga No. 69851, 1997 Ohio App.

LEXIS 713 (Feb. 27, 1997). Here, the trial court instructed the jury as such, and, again, the jury is presumed to follow the proper instructions of the trial court.

{¶33} Therefore, we cannot say that the trial court abused its discretion in allowing defense counsel to make these comments in closing arguments; the inferences counsel made can be drawn from the testimony given in this case.

{¶34} In light of the above, we do not find any prejudicial misconduct during the case in chief or defense counsel's closing argument. The first and second assignments of error are overruled.

{¶35} In the third assignment of error, Allen asserts that the trial court's judgment should be reversed and a new trial ordered because the jury's verdict in favor of Jackson and AJ Automotive was against the manifest weight of the evidence.

{¶36} The manifest weight of the evidence involves a party's burden of persuasion and is "quantitatively and qualitatively different from" the sufficiency of the evidence. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19, 23. In *Eastley*, the Ohio Supreme Court made it clear that the standard of review for manifest weight of the evidence set forth in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies in civil as well as criminal cases. *Eastley* at ¶ 17. In *Thompkins*, the Ohio Supreme Court described manifest weight of the evidence as follows:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be

established before them.   Weight is not a question of mathematics, but depends on its effect in inducing belief."

(Emphasis omitted.) *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

**{¶37}** In assessing whether a jury's verdict is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered.   *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶38}** In weighing the evidence, we are guided by a presumption that the findings of the trier of fact are correct.   *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).   This presumption arises because the trier of fact had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."   *Id.*   Thus, "to the extent that the evidence is susceptible to more than one interpretation," we will "construe it consistently with the jury's verdict."   *Berry v. Lupica*, 196 Ohio App.3d 687, 2011-Ohio-5381, 965 N.E.2d 318, ¶ 22 (8th Dist.), citing *Ross v. Ross*, 64 Ohio St.2d 203, 414 N.E.2d 426 (1980).   *See also Seasons Coal* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978) (When conducting a manifest weight of the evidence review, ""every reasonable presumption must be made in favor of the judgment[.] * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is * * * most favorable to sustaining the verdict and judgment."")

**{¶39}** Allen argues that Padgett's claim that her engine had a complete overhaul was not

credible since Padgett testified he never saw an invoice from Clark Automotive showing the work had been done, could not verify Clark Automotive's work unless the engine block was disassembled, and was not an expert. Allen points to her expert's testimony that it was obvious from his examination of her car's engine that AJ Automotive claimed to do work it did not do; therefore, "the greater of the preponderance of the evidence clearly established that quality of the repairs or the issues claimed to have been fixed were not." According to Allen, the jury lost its way and should have found that AJ Automotive never took care of the car's underlying overheating problems and, as supported by her expert's testimony, the engine problems "probably" began because of engine overheating.

{¶40} However, the jury, as trier of fact, was in the best position to judge the credibility of witnesses and resolve any conflicts in the evidence. Dillard testified that Allen brought her car in with over 82,000 miles on it, and AJ Automotive overhauled the engine and test drove the car before returning it to her in October 2009. Padgett testified that he checked over the work that Clark Automotive did before he installed the engine, saw that all the pistons were in place, and installed the new head gasket.

{¶41} When Allen returned on November 3, she did not complain of engine trouble. Allen claimed her car was leaking antifreeze and AJ Automotive determined she needed a new overflow bottle and cap. At this visit, Padgett performed pressure checks and concluded that the car did not need a new radiator. Three days later, Allen returned because her car was overheating. Although Padgett and Dillard admitted it was strange that a radiator would go bad three days after it checked out fine, they both also testified that it was not unusual for things to quickly deteriorate on a high-mileage older car.

{¶42} When Allen returned in January, no one at AJ Automotive examined the car before

it was towed to DAD's Automotive. Stecker testified that he did not inspect the car for a couple of months, due in part to a lack of communication from Allen's mother, and it sat on his unsecured lot from January until May of 2011. From October 26 through December 15, Allen put almost 1,500 miles on the car, which already had over 80,000 miles on it. And after Allen initially had the engine rebuilt by AJ Automotive in October 2009, she returned with complaints that were unrelated to the engine.

{¶43} Thus, although the car went through a series of costly repairs and Allen was left still without a working vehicle, and although her car was missing a piston and the starter wires were unconnected when Stecker finally inspected it, the jury found that AJ Automotive was not liable. In light of the above, we do not find that the jury's verdict was against the manifest weight of the evidence.

{¶44} The third assignment of error is overruled.

{¶45} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR