The STATE of Ohio, Appellee,

v.

RENNER, Appellant.

[Cite as *State v. Renner* (1998), 125 Ohio App.3d 383.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16455.

Decided Jan. 16, 1998.

*Mathias H. Heck, Jr.*, Montgomery County Prosecuting Attorney, and *Steven J. Ring*, Assistant Prosecuting Attorney, for appellee.

*Barry S. Galen*, for appellant.

BROGAN, Judge.

In this case, defendant–appellant, William Renner, appeals from a jury verdict convicting him of felonious assault, with a firearm specification. Renner was

tried on three charges: abducting Taleisa with a gun, and feloniously assaulting Taleisa by discharging a gun from a vehicle. The latter two charges included firearm specifications. After trial, Renner was found not guilty of abduction and of one charge of felonious assault and a mandatory five years on the firearm charge, to be served prior to and consecutively to the term for the felonious assault.

Briefly, the pertinent facts are as follows. Beginning in high school, Renner and Taleisa Jones dated. While still in high school, Taleisa became pregnant with Renner's child, and after Taleisa graduated, the pair lived together with their daughter, Exelis, in Miamisburg, from approximately May 1995 until September 1996. In the meantime, Taleisa gave birth to another child, Isaac. In September, 1996, Taleisa moved back to her mother's house, but she and Renner continued to see each other until around the end of October 1996. At that time, they argued over the telephone and had no contact for approximately two weeks. According to Taleisa, she was not angry or upset with Renner during the conversation; instead Renner was angry at her because she had broken up with him and would not move back in. On the other hand, Renner's testimony was that Taleisa was angry with him because she thought he was seeing other women. This complete disparity in accounts typifies the contradictions rampant in the testimony of the only two witnesses to the crimes with which Renner was charged.

On the evening of November 14, 1996, Renner came to the Arby's Restaurant where Taleisa was working. According to Renner, he had spoken to Taleisa three times earlier that evening and she knew he was coming to pick her up. Taleisa denied this, but independent, neutral testimony supported Renner's account. Specifically, Taleisa's supervisor, Mary Smith, testified that Taleisa received three phone calls that evening from a man. Smith also testified that she and Taleisa both left the restaurant at approximately 1:03 a.m. Smith offered Taleisa a ride home, but Taleisa declined, telling Smith that her ex-boyfriend had called earlier and was there to take her home.

Smith testified that Taleisa walked over to Renner's truck and did not stop at the driver's side. Instead, Taleisa went to the passenger's side and got in. However, Taleisa's story was that she walked to the driver's side, where she saw a gun sitting on the console. Renner looked angry and told her to get in the truck. Taleisa was scared and did as Renner said, because of Renner's tone of voice and because of Renner's prior acts of violence against her, including one occasion when he had placed the gun in her mouth.

Allegedly, Renner had purchased the gun at a flea market some months before, when he and Taleisa were thinking about moving into his mother's home in Miamisburg. Because Renner and Taleisa are not of the same race, threats had

been made against them, even by neighbors, and Renner wanted a gun for protection. His testimony was that the gun had never been taken out of the car. He also denied ever threatening Taleisa with the gun. His testimony was that Taleisa had been violent toward him in the past and had hit and scratched him on a number of occasions. Additionally, she had done property damage, especially when she moved out of their apartment.

In any event, after Taleisa got in the truck, they began to argue. Again, their accounts differ dramatically. Taleisa's story is that Renner immediately began calling her a "whore" and a "bitch," hit her twice with a closed fist, and hit her three times above her left eyebrow with the butt of the gun. At that point, they were traveling on Alex–Bell Road, and she jumped out of the car because she did not want to be hit anymore. According to Taleisa, Renner was driving about thirty miles an hour at the time. After she jumped out, he slammed on the brakes, and the car skidded to a halt. Taleisa testified that when she looked "back," Renner was pointing the gun straight out the door of the truck. Renner did not get out of the truck, but fired directly at her. Her testimony also was that the she was right in the doorway of the truck when he shot at her. She got up and ran, and heard a second shot a few seconds later. She then ran to a neighboring house, and the occupants called the police.

Renner testified that he had dinner that evening at his sister's house and that he and his brother-in-law later went to a drive-through, where he purchased and drank a forty-ounce beer. After returning to his sister's house, he contacted Taleisa and then asked his sister if he could borrow some money from her or sell her something because Taleisa needed money for the kids. His sister agreed to purchase wedding rings Renner had previously bought for himself and Taleisa, and gave him a check for $250.00. Renner then went to his own house, cleaned up, and drove to Arby's. Upon arriving, he went to a pay phone next to Arby's and called Taleisa to let her know he was there. A few minutes later, Taleisa walked out with her supervisor and got in the truck.

Renner testified that the gun was not on top of the console, but was underneath, where it was always kept. Taleisa knew where the gun was and had handled it before. His story was that after getting in the truck, Taleisa began accusing him of seeing other women. She then started hitting him and scratching him while he was trying to drive. At some point, she reached under the console and got the gun. They continued to struggle, and Renner slammed on the brakes. The passenger's door flew open, the gun went off, and Taleisa rolled out of the truck. Renner denied having the gun in his hand or shooting it. He claimed that after the shot, he did not know if the gun was still in Taleisa's hand or where it was. He then pulled across the street into a parking lot and reached over to close the door. At that point, he saw the gun on the floor of the

passenger's seat and put it back under the console. Since Taleisa no longer had the gun, he got out of the car to see if she was all right. However, he didn't see her, and she didn't answer when he called. As a result, he turned and started to walk to a pay phone to call his sister.

The police arrived as Renner was walking away. They first detained him for identification and then arrested him after Taleisa identified him. Subsequently, Renner was charged with abduction and the two counts of felonious assault that were previously mentioned. As was noted above, the jury found Renner guilty only of felonious assault in connection with the discharge of a firearm from a vehicle.

On appeal, Renner raises the following three assignments of error:

"I. The trial court erred in allowing testimony concerning Mr. Renner's prior assaults upon Ms. Jones. This evidence should have been excluded pursuant to Rule of Evidence 404(B), and it does not fit within any of the enumerated exceptions.

"II. This court should overturn Mr. Renner's conviction because the verdict is against the manifest weight of the evidence.

"III. Defendant Renner was prejudiced and denied a fair trial due to ineffective assistance of counsel resulting in a deprivation of the long acknowledged sixth amendment right to effective counsel."

After considering appellant's arguments, we agree that the trial court erroneously admitted prejudicial evidence. Because we further find a reasonable possibility that the inadmissible evidence contributed to appellant's conviction, we reverse the judgment of conviction and remand this case for a new trial. Moreover, because our disposition of the first assignment of error is dispositive, the remaining assignments of error will not be addressed.

## I

As was noted above, Renner contends in the first assignment of error that the trial court erred in admitting evidence about prior acts of violence Renner had committed against Taleisa Jones. In this regard, Taleisa was allowed to testify that Renner had previously placed a gun in her mouth on one occasion between January and September 1996. However, she did not give a specific date for the incident, nor did she provide any details. Taleisa was also permitted to testify that Renner had slapped her on a number of occasions, causing bruises and a black eye. Other than mentioning a specific incident of abuse in September 1996, Taleisa did not give any particular dates or discuss individual incidents of abuse. Additionally, she did not provide details of the September incident, beyond saying that Renner had hit her and had given her bruises. The state's

asserted purpose for raising these matters at trial was to prove abduction, *i.e.*, to show that while Renner used no words of threat to make Taleisa get in the truck that evening, she felt threatened and complied because of the presence of the gun and because of past events of violence, including a specific act of violence involving the gun.

In this context, the elements of abduction, as alleged in the indictment in this case, are that "[n]o person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear." R.C. 2905.02(A)(2). In *State v. Kelly* (1993), 89 Ohio App.3d 320, 624 N.E.2d 733, the court held that previous acts of domestic violence were not admissible as "other acts evidence" because they were not inextricably related to the crimes of rape and abduction with which the defendant had been charged. However, the court did find the evidence relevant and admissible as bearing on a wife's state of mind in failing to escape or retaliate against her husband, who had abducted her and their sons. In this regard, the court noted:

"Teresa [the wife] testified that the reason she did not try to escape or retaliate was that she knew that appellant would either physically abuse her or that he would kill her and that she could tell that he was capable of becoming violent towards her by the tone of his voice. Teresa also testified that the reason she did not scream when appellant forced her and their sons to get into the car was because of an earlier incident when he beat her for screaming. Teresa further testified that she was afraid that appellant would shoot her as he had threatened on the morning of November 9 and that he constantly had the gun in his possession. Thus, the incidents of prior domestic violence were relevant to Teresa's state of mind and why she did not try to escape from appellant or summon the police. This bears directly upon the elements of 'privilege' and 'force' inherent to the charges of kidnaping and abduction in this case." *Id.* at 323–324, 624 N.E.2d at 735.

Crediting Taleisa Jones's testimony in full and discounting completely the contradictory testimony from Mary Smith, we believe that the issue of intent provided a sufficient basis for admitting evidence about prior acts of violence. Although most people might not experience fear at simply viewing a gun in an automobile, the prosecution was entitled to show that Taleisa did experience fear due to the effects of past circumstances and experiences. On the other hand, the inherently prejudicial nature of such evidence requires that it be received with caution.

■ In his brief, Renner points out two other examples of improper and prejudicial testimony, both of which relate to Renner's conduct after being arrested. Specifically, Renner used profane, insulting language to the police

officers and was highly uncooperative at the police station, all of which the police officers testified to in detail during the state's case. For example, the following exchange occurred at trial during the testimony of Officer Barnett, the female arresting officer:

"Q. Did he at any point in time use any profane language directed at you?

"A. Yes, ma'am.

"MR. BIRT: I will object, Your Honor. He's not charged with using profane language to the police officer. It is irrelevant and prejudicial.

"MS. LAFFERTY: Your Honor, it goes to his state of mind at the time this happened. That is clearly at issue. It goes to his state of mind when he was in the police cruiser after the arrest, not when the alleged event in the Jimmy took place, Your Honor."

The court overruled the objection, and the officer was allowed to testify as follows:

"A. He called me a fucking bitch. * * * I spoke to Mr. Renner, advised him I had not spoken to him in that manner and I didn't appreciate it. And he said, 'Don't be upset,' some—I have a quote in my report, but it was he thinks of all women in that manner. It's just a name."

Previously, the prosecutor had commented in opening statement that the police officers would tell the jury about degrading comments Renner had made to the female police officer, and that these comments would be consistent with how Renner had been degrading women all night. Further consistent with this prosecution theme, Officer Barnett also testified, over objection, as follows, about an incident that occurred when Renner was being searched by a male officer at the jail:

"A. I had requested Officer Jensen search Mr. Renner thoroughly. He had been patted down at the scene, but not by myself. Being a male, I requested that Officer Jensen pat him down. During the pat-down, Mr. Renner turned and looked at me and—

"MR. BIRT: I object to any further statement at this time, Your Honor, as not being relevant to what happened in the jail. This is too far removed in time and space.

"MS. LAFFERTY: Your Honor, it is a statement from the Defendant.

"MR. BIRT: It is a statement, and it may be a prejudicial statement, Your Honor, but it is not probative to the charges in the indictments.

"THE COURT: Your objection is noted. Continue.

"* * *

"A.   As Officer Jensen patted down Mr. Renner, he made a statement, and I have a quote in my report, 'Brenda, you want to feel my nuts.  You want to look at my dick.  Come on over here and do this yourself.'

"Q.   Was that in any—was that a response to anything you had said to him?

"A.   No, ma'am.  I was at the desk beginning paperwork."

Later in the state's case, Officer Hyatt, another police officer, was permitted to testify over objection that the defendant was "cocky and arrogant."  After defense counsel objected to this testimony, the following further exchange then occurred:

"MS. LAFFERTY: Your Honor, it is—I believe that the officer is going to testify to everything that's been consistent with what all of the other witnesses have said as far as the Defendant's attitude that night.

"There's been testimony that he was drinking, there was testimony that he was abusive, and this is consistent with everything else that happened earlier that evening.

"The Court: Mr. Birt.

"MR. BIRT: Well, Your Honor, he may have a bad attitude, but he's not on trial for that.  It's not probative."

Following this exchange, the court overruled the defense objection.  Officer Jensen was also permitted to testify about the pat-down incident as well as the fact that Renner used the word "fuck" in relation to sexual relations with Officer Jensen's wife and mother.

In our opinion, none of the above evidence had even marginal relevance to the crimes for which Renner was charged.  Instead, based on the state's comments during opening statement and in response to defense objections, the evidence was elicited for the purpose of showing that Renner was of bad character, had a bad attitude toward women, and acted accordingly at the time of the alleged crimes.  The state also advances a similar position on appeal, arguing that evidence of Renner's intoxication, belligerence, and profanity was relevant to whether or not Renner was guilty.  Had the crimes charged been intoxication, belligerence, or profanity, we might agree.  However, these were not the crimes for which Renner was charged.  In our view, this case involves precisely the situation Evid. R. 404 was designed to prevent.

In general, Evid. R. 404 prohibits admission of character evidence "to prove that the defendant acted in accordance therewith on a particular occasion."  Evid.

R. 404(B) provides certain limited exceptions, allowing evidence of other acts to show matters like "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Similarly, R.C. 2945.59 allows proof of a defendant's contemporaneous, subsequent, or prior acts to show "motive or intent or the absence of mistake or accident on the defendant's part, even if the evidence tends to show that the defendant has committed another crime." The Supreme Court has explained:

"Evid. R. 404(B) is essentially an extension of Evid. R. 404(A) which is intended to preclude a prejudicial attack on a defendant's character. Generally, extrinsic acts may not be used to prove the inference that the accused acted in conformity with his other acts or that he has a propensity to act in such a manner." *State v. Smith* (1990), 49 Ohio St.3d 137, 140, 551 N.E.2d 190, 193.

As was noted in *State v. Goines* (1996), 111 Ohio App.3d 840, 677 N.E.2d 412, " '[a]n accused cannot be convicted of one crime by proving he committed other crimes or is a bad person.' " *Id.* at 847, 677 N.E.2d at 417, quoting *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180.

▮ After examining the record, we cannot find the trial court's error harmless, since a reasonable possibility exists that the "improperly admitted testimony concerning other acts contributed to the defendant's conviction." *State v. Elliott* (1993), 91 Ohio App.3d 763, 771, 633 N.E.2d 1144, 1148. In the first place, we note that Renner's jury was composed of eight women and four men, any one of whom could easily have taken a significant degree of offense to Renner's statements about women and his conduct at the police station. Further, the verdict of guilty on one assault charge is inconsistent with a finding of not guilty on the other charges. Since the evidence on the two assault charges consisted almost exclusively of the principal parties' disputed versions of events, no logical reason exists for accepting the victim's account in one instance and rejecting it in the other.

Moreover, the limited physical evidence in this case either does not help establish the defendant's guilt or does raise doubt about the victim's account. For example, an atomic absorption test conducted on Renner's hands after the incident showed no traces of gunshot residue. Although such residue can be removed through washing or excessive wiping of hands, no evidence was presented that these events occurred. Renner was handcuffed almost immediately after the incident, and the atomic absorption test was performed well within the time limits for conducting the test. Additionally, chemical tests performed on the gun revealed no traces of blood.

Similarly, the evidence at the scene casts doubt on Taleisa's version of events. As was noted above, Taleisa testified that she jumped out of the truck; that the truck was traveling thirty miles per hour, and that Renner did not put on the brakes until after she jumped out. Her testimony also was that she was on the ground, right next to the doorway of the truck when Renner fired. Taleisa further said that Renner pointed the gun straight out of the truck, firing directly at her. However, the skidmarks from the truck at the scene were measured, with the left skidmark being thirty–four feet, five inches, and the right being twenty–nine feet, three inches. Although no accident reconstruction expert testified, logic indicates that an individual jumping out the right side of a moving vehicle would not roll forward thirty feet and land right in the doorway of a vehicle traveling in a different direction. The physical evidence, including the location of the shell casing near the end of the skid marks, is also not inconsistent with Renner's version of events, as Renner indicated that he slammed on the brakes while he and Taleisa were struggling over the gun, that the door to the truck fell open, and that the gun discharged.

We also note that only one shell casing was found, despite Taleisa's claim that two shots were fired. And finally, Renner's testimony that Taleisa scratched him on the chest, hands, and arms is supported by the testimony of Officer Barnett, who said that she observed cuts on Renner's hands at the police station. Although photographs of Renner's hands were taken, this potentially exculpatory evidence somehow disappeared from the police file and was not available for the defense to use at trial.

Under the circumstances, especially when the victim's credibility was placed in serious question by a neutral, independent witness, the admission of prejudicial evidence about Renner's character could well have persuaded the jury that Renner was a bad person and deserved to be punished. As the United States Supreme Court emphasized in *Old Chief v. United States* (1997), 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574:

"Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, * * * but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them

as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Id.* at 181, 117 S.Ct. at 651, 136 L.Ed.2d at 588, quoting *Michelson v. United States* (1948), 335 U.S. 469, 475–476, 69 S.Ct. 213, 218–219, 93 L.Ed. 168, 173–174.

Likewise, in the present case, while Renner was not clothed with a presumption of good character, he was nonetheless entitled to a trial free of assaults on his character.

In reversing the conviction, we stress that we specifically disapprove of prosecution attempts to obtain convictions through use of clearly inadmissible evidence. We also caution trial courts to be more vigilant in restraining efforts to infuse cases with irrelevant character evidence. Compare *State v. Flaherty* (1992), 78 Ohio App.3d 718, 723, 605 N.E.2d 1295, 1298 (reversing conviction based on state's presentation of several vignettes of irrelevant evidence, including the defendant's comment several years before the crime that "she had no doubt in her mind that she was going to hell." The court also noted many prior occasions on which it had reversed convictions after admission of irrelevant and prejudicial evidence). We agree with the *Flaherty* court on the occasional need to remind trial courts of their duty to preserve the fairness of criminal proceedings.

Based on the foregoing discussion, the judgment of conviction is reversed and this case is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

WOLFF and FAIN, JJ., concur.