OPINION
{¶ 1} Christopher Jordan is appealing the judgment of the Montgomery County Common Pleas Court, which granted summary judgment to Dayton Testing Labs, Gerald Lee, and the Cincinnati Insurance Company. Additionally, Jordan is appealing the judgment of the court for Central Mining Equipment based upon a jury verdict in its favor and its denial of Jordan's motion for a new trial.
 {¶ 2} Christopher Jordan was an employee of Dayton Testing Labs (hereinafter "DTL"), where he worked as a driller. DTL was a company operated and predominantly owned by Gerald Lee that was in the business of conducting soil samples. DTL had purchased a CME-55 drill rig in 1990 from Central Mining Equipment (hereinafter "CME"). It was on this drill rig that Jordan was assigned to work. Additionally, DTL had a commercial auto insurance policy with Cincinnati Insurance Company (hereinafter "CIC").
 {¶ 3} Christopher Jordan was hired in 1996 by DTL as a driller's helper. Jordan was initially assigned to work as the helper to Wayne Knight, who was being promoted from driller's helper to driller. Jordan was present while a former driller was training Knight for two weeks. Jordan proceeded to work as a driller's helper to Knight for approximately six weeks. However, Knight had an absenteeism problem that resulted in Jordan and Knight often not going out to jobs. Due to his absenteeism problem, Knight was subsequently fired, and Jordan was promoted to driller. Lonnie Burton, another employee of DTL, trained Jordan for approximately four to six additional weeks on being a driller on the CME equipment.
 {¶ 4} The machine Jordan operated was a CME-55 drill. The drill rig was built onto a Ford 500 truck. The machine had an auger that was used to drill into the ground. The machine was equipped with a cathead device that would drop a weight and was used to drive an apparatus into the ground to take a sample. However, this cathead device's usefulness has been virtually eliminated by the addition of a pneumatic hammer that drove a split spoon into the ground to take soil samples. Also, the machine was equipped with five safety kill switches, two mushroom type switches and three wobble switches. Of the three wobble switches, one of the switches was located above the cathead and the other two were on the mast near the auger. Although Jordan had replaced the mushroom type switches on the machine when they became damaged, Jordan had never replaced a wobble switch.
 {¶ 5} In February of 1999, Jordan was working as a driller on the CME-55 taking soil samples at a future site of a fast food restaurant. His driller's helper at the time was James Davidson. Jordan and Davidson had drilled down approximately five feet and had just taken a soil sample. At this point, Davidson had gone to the side of the truck to bag and label the soil sample. Jordan had restarted the auger's rotation when he felt a jerk on his right leg and became entangled in the auger. Davidson heard a commotion and came around the truck to find Jordan being swung around by the auger. Davidson went to hit a kill switch but was knocked down by Jordan's rotating body. Davidson got up and finally was able to hit the kill switch stopping the auger. Although he was rushed to the hospital, Jordan suffered several severe injuries, including the amputation of his right leg above the knee.
 {¶ 6} Subsequently, Jordan filed a lawsuit against DTL and Lee, alleging an intentional workplace tort. Additionally, he filed an uninsured motorist claim against CIC and several product liability claims against CME for defective design and failure to warn as it related to this CME-55. All of the parties filed motions for summary judgment before the trial court. The trial court subsequently granted summary judgment in favor of DTL and Lee, allowing the matter to proceed to trial on the claims against CME.
 {¶ 7} At trial, the jury returned a verdict in favor of CME on all counts. Upon inspection, the court determined that the jury had not completed any of the interrogatories prior to rendering its verdict. After discussing the issue with the attorneys, the trial court decided to send the jury back to complete the interrogatories. The jury communicated to the trial court that it was confused regarding the interrogatories, believing that they did not have to sign them if they found for CME. The trial court added boxes for the jury to check for either yes or no to the interrogatories and resubmitted them to the jury with new verdict forms for them to complete. The jury finally completed these interrogatories and the new verdict forms in favor of the defense.
 {¶ 8} After the trial, the court apparently granted summary judgment in favor of CIC, finding that it could not be liable absent any liability on the part of DTL, Lee, or CME.
 {¶ 9} Jordan has now filed this appeal from the trial court's grant of summary judgment in favor of DTL, Lee, and CIC. Additionally, Jordan is appealing certain decisions by the trial court in the course of the trial against CME and in denying his motion for a new trial. Jordan has raised the following assignments of error.
 {¶ 10} "1. The trial court erred by granting dayton testing laboratory's and lee's motion for summary judgment as to the intentional tort claim.
 {¶ 11} "2. The trial court erred in granting judgment to cincinnati insurance on appellants' declaratory action for um/uim coverage.
 {¶ 12} "3. The trial court erred in entering judgment in favor of cme with respect to all claims and in denying appellants motion for a new trial.
 {¶ 13} "4. The verdict was against the manifest weight of the evidence."
Appellant's first assignment of error:
 {¶ 14} Jordan argues that the trial court erred in granting DTL and Lee summary judgment based on the determination that Jordan could not prove that DTL and Lee were aware that the CME-55 in its condition was substantially certain to injure its employees. We agree.
 {¶ 15} Our review of the trial court's decision to grant summary judgment is de novo. See Helton v. Scioto Cty. Bd. ofCommrs. (1997), 123 Ohio App.3d 158, 162. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See State ex rel. Grady v.State Emp. Relations Bd. (1997), 78 Ohio St.3d 181, 183,1997-Ohio-221; Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 65-66.
 {¶ 16} In order to establish an intentional tort claim by an employee against an employer, the employee must demonstrate (1) that the employer had knowledge of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) that the employer had knowledge "that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe v. Jeno's Inc. (1991), 59 Ohio St.3d 115. In order to prove an intentional tort claim, an "employee must prove that the employer knew that because of the exact danger posed, the employee would be harmed in some manner similar to the injury sustained or that the employer knew that because of the exact danger posed, it was highly probable (substantially certain) that the employee would be harmed in some manner similar to the injury sustained." Richie v. Rogers Cartage Co. (1993),89 Ohio App.3d 638, 644.
 {¶ 17} In Moebius v. General Motors Corp., Montgomery App. No. 19147, 2002-Ohio-3918, this Court looked at an appeal from the grant of summary judgment to the defendant employer in an intentional tort complaint. In Moebius, the employee worked on a machine in which she often had to hit the kill switch that immediately stopped the machine in order to perform part of her duties. Id. Unbeknownst to the employee, the employer had inserted a five second delay on the kill switch. Id. The employee was subsequently injured when she reached into the machine immediately after having hit the kill switch when the machine did not immediately stop. Id. This Court held that a genuine issue of material fact remained as to whether Moebius's injury was substantially certain to occur. Id.
 {¶ 18} In reaching this conclusion, this Court focused on 1) two prior incidents where employees had gotten articles of clothing caught in a similar manner to Moebius even though there was no evidence indicating the employer knew of these circumstances, 2) Moebius's lack of knowledge regarding the alteration to the safety device, and 3) expert testimony that altering the safety device without informing the employees was substantially certain to cause injury. Id. Additionally, we noted in our opinion that although "the absence of prior injuries is a factor to consider in determining whether [the employer] knew that Moebius's injuries were substantially certain to occur[,] * * * [the] absence of a prior injury is not the sole factor in determining [the employer's] knowledge." Id. at ¶ 38; see alsoHarbin v. Ohi-Tec Mfg., Inc., Clark App. No. 2001 CA 70, 2002-Ohio-2923 (finding evidence of substantial certainty of harm where evidence employer was aware of a machine's potential to malfunction and knew the potential harm of such malfunction even though there had been no prior injuries on the machine).
 {¶ 19} Jordan argues that this case is similar to Moebius
and thus that the trial court erred in granting DTL's motion for summary judgment. We agree. Similar to Moebius, Jordan presented evidence that his employer altered the safety device on the machine, specifically shortening the wobble switches that were on the mast. CME stated that the wobble switches had been intact and at their proper length when DTL had picked up the CME-55. Jordan stated that when he had been hired at DTL the mast wobble switches had already been at the shortened length they were at the time of the accident. Jordan specifically denied shortening any wobble switches and had only replaced the mushroom type kill switches.
 {¶ 20} Moreover, a CME representative at trial stated that the cathead wobble switch had never been the same length as the mast wobble switches but had been a shorter wobble switch when it had been sold. This is in direct contrast to Lee's statement that Jordan asked to shorten the wobble switch on the cathead. Logically, Jordan could not have asked to shorten the cathead wobble switch if the switch had been shortened at the factory years prior. However, regardless of the CME representative's testimony, Jordan denied asking to shorten any switches and in a motion for summary judgment all of the evidence must be interpreted in favor of the non-moving party, which in this case was Jordan.
 {¶ 21} Further, Lee admitted that he inspected the drill rigs at least once a week, including this CME-55 drill rig. Although Lee denied permitting anyone to shorten the wobble switches on the mast, Lee did theorize that the wobble switches on the mast of the rig that Jordan was working on had been shortened by normal wear and tear. Jordan presented evidence at the trial court level that Lee was aware that the wobble safety switches on the mast of the drill rig had been shortened.
 {¶ 22} Moreover, Jordan presented evidence that Lee was aware of the danger posed by the rotating auger on the drill rig. Jordan presented the affidavit of a former employee, Ray Wilson, who stated that he had on several occasions gotten a glove caught in the auger. Additionally, Lee stated in his deposition that another employee, Lonnie Burton, had gotten a pants leg caught in the rotating auger, but fortunately another employee was able to hit a kill switch and prevented Burton from being seriously injured. Lee stated in his deposition that Burton nearly had his leg torn off in this incident. Thus, Jordan presented evidence that Lee was aware of at least one prior similar accident involving this drill rig and that the machine posed a risk of amputating a limb.
 {¶ 23} We find this similar to Moebius where two prior incidents had occurred where employees had gotten articles of clothing caught in the machine prior to Moebius's injury. Moreover, the evidence is stronger in Jordan's case because Lee had actual knowledge of Burton's incident and the potential harm of having a leg torn off by the machine. Whereas in Moebius,
the evidence was unclear whether the employer was aware of the prior injuries.
 {¶ 24} DTL argues that Jordan had worked on the drill rig for three years without a prior accident and that other employees had worked on the same drill rig in the several years prior without an accident. However, as we stated in Moebius the absence of prior injuries on a machine is not the sole factor in determining whether the employer had prior knowledge, but merely one factor to consider. Although DTL had not had a prior injury on the drill rig, DTL had knowledge of at least one prior accident where an employee's pants had been caught in a drill rig's auger and that the potential harm from this incident was that the employee could have lost his leg. Moreover, Jordan presented evidence that he received only a few weeks of training on how to be a driller. Jordan presented evidence that his training was insufficient to be a drill rig operator. Thus, Jordan may have been improperly performing his duties for years and only been fortunate to have not had an accident sooner.
 {¶ 25} Also, as in Moebius, the employee was not informed of the alteration of the safety device. In Moebius, the employer had added a five second delay to the kill switches' stopping of the machine and failed to inform the employees working on the machine of the change. Similarly, Jordan's deposition established that wobble switches were at the same length on his date of hire as on the date of his injury, which DTL admitted was shorter than originally designed. Additionally, nothing in the safety manual informed Jordan of the proper length of the wobble switches. Therefore, Jordan had no knowledge that the wobble switches had been shortened or what their proper length should have been. Thus, both in Moebius and in the instant case, the employer made the employee work on a machine with an altered safety device and failed to inform the employee of the alteration.
 {¶ 26} Although Jordan did not offer expert testimony that the shortened wands created a hazardous condition that DTL was substantially certain would result in injury to Jordan, expert testimony was before the trial court that the shortened wobble switches were a cause of the accident. (Barnett depo. at 227). Professor Ralph Barnett, an expert hired by CME, stated in his deposition that if the wands had been at their full length Jordan would have inadvertently hit the wands when his leg was grabbed by the auger. (Id. at 45). Further, Barnett opined that even if Jordan had kicked the auger as alleged by CME, Lee, and DTL, if the wands had not been shortened Jordan would have been spared his injury. (Id. at 187). Barnett stated that shortening the wands removed a major safety device from the drill rig and that if Lee knew the wands had been shortened and allowed the shortening of the wands, knowing the effect of this act, his conduct had been reckless. (Id. at 57-58).
 {¶ 27} Considering Lee and DTL were at least aware that the mast wobble switches, which were a safety device, had been shortened, failed to ever inform Jordan that the wobble switches on the mast had been compromised, and had a prior similar near miss in which an employee nearly lost his leg when his pants got caught in the auger but was saved by a co-worker hitting a kill switch, we believe the trial court erred in determining that this evidence when construed in favor of Jordan did not create a genuine issue of material fact as to whether DTL and Lee were substantially certain Jordan's injury would occur. Therefore, we find Jordan's first assignment of error has merit and is sustained.
Appellant's second assignment of error:
 {¶ 28} Jordan argues that the trial court erred in apparently granting summary judgment in favor of CIC. We disagree.
 {¶ 29} The trial court eliminated Jordan's claims against CIC based on the conclusion that no claim could be maintained against CIC if no claims remained against DTL, Lee, or CME. Jordan claims that this misreads the statute that provided that UM/UIM insurance remained despite any statutory immunity that may have prevented liability on the part of the owner of the uninsured motor vehicle. CIC raised additional arguments in support of its motion for summary judgment and argues on appeal that these additional issues support the grant of summary judgment even if the trial court's reason for its decision was in error. CIC argues that no UM/UIM coverage applies to Jordan's accident because the drill rig was not a motor vehicle, the policy had an exclusion for mobile equipment such as this drill rig, and Jordan was not injured by a motor vehicle as is required for UM/UIM coverage to arise by operation of law under the statute, but by an auger attached to the vehicle.
 {¶ 30} As it is dispositive of this assignment of error, we will first address CIC's argument that even if the drill rig qualifies as a motor vehicle, there would still not be any liability for CIC because the accident that injured Jordan did not arise out of the ownership, maintenance, or use of a motor vehicle. CIC argues that Jordan's injuries arose out of the auger, not the motor vehicle truck.
 {¶ 31} The relevant version of R.C. 3937.18(A)(1) provided:
 {¶ 32} "Uninsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage and shall provide protection for bodily injury or death under provisions approved by the superintendent of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, suffered by any person insured under the policy. For purposes of division (A)(1) of this section, a person is legally entitled to recover damages if he is able to prove the elements of his claim that are necessary to recover damages from the owner or operator of the uninsured motor vehicle. The fact that the owner or operator ofthe uninsured motor vehicle has an immunity, whether based upon astatute or the common law, that could be raised as a defense inan action brought against him by the person insured underuninsured motorist coverage does not affect the insured person'sright to recover under his uninsured motorist coverage." (Emphasis added.)
 {¶ 33} Under the relevant version of R.C. 3937.18(A), UM/UIM coverage arising by operation of law only provided for injury "arising out of the ownership, maintenance, or use of a motor vehicle * * *". In order to determine whether the bodily injury arose out of the ownership, maintenance and use of a motor vehicle, the court must focus on whether the motor vehicle was the "instrumentality causing [the injury]". Howell v.Richardson (1989), 45 Ohio St.3d 365, 369, see also Kish v.Central Nat'l Ins. Group of Omaha (1981), 67 Ohio St.2d 41,50-51. The Ohio Supreme Court in Kish stated, "[t]he relevant inquiry is whether the chain of events resulting in the accident was unbroken by the intervention of any event unrelated to the use of the vehicle." Kish, supra at 50.
 {¶ 34} Other Ohio cases have found that the injury did arise from the ownership, maintenance or use of the motor vehicle even when the uninsured vehicle itself did not cause the injury.Bakos v. Insura Prop. Cas. Ins. Co. (1997),125 Ohio App.3d 548, 555 (finding that UM/UIM coverage arose where the injured was hurt as a result of an assault by a passenger attempting to gain control over the vehicle); State Auto. Mut. Ins. Co. v.Rainsberg (1993), 86 Ohio App.3d 417 (holding the injury arose from a motor vehicle accident where the injured struck passengers of an uninsured stalled vehicle even though the passengers were outside of the car, attempting to divert traffic); Miller v.Rollins Leasing Corp. (Sept. 23, 1999), Franklin App. No. 98AP-1347 (finding that an injury arose out of a motor vehicle accident where an employee was injured when unloading cat food from an immobile trailer); Grange Mutual Casualty Co. v. Darst
(Sept. 11, 1998), Miami App. No. 97 CA 59 (finding UM/UIM coverage where children were injured in a fire as a result of being left alone with matches in an uninsured vehicle by its owner.)
 {¶ 35} Liability for UM/UIM insurance will not arise if the "chain of events resulting in the accident which caused [the insured's] injuries was broken by the intervention of an event unrelated to the operation or use of the uninsured vehicle."Miller, supra. quoting Carter v. Burns (1993),90 Ohio App.3d 787, 792.
 {¶ 36} In support of its argument that Jordan's injury did not arise out of the ownership, maintenance, or use of a motor vehicle, CIC points to the fact that Jordan was outside of the truck when his leg was grabbed by the auger. CIC distinguishes this case from other cases where the injury has been found to arise from the ownership, maintenance, or use of the vehicle. At the time of Jordan's injury, the drill rig was parked and the auger was in the process of drilling a hole in the ground. The accident did not occur on a roadway or involve motor vehicles in a typical motor vehicle accident. In fact, outriggers had been placed in the ground from the drill rig to stabilize the rig prior to drilling. Additionally, although both the engine of the vehicle and the drill rig's engine use the same power source, the engine to the auger can only be started from the rear of the vehicle, not from the cab. We agree with CIC. Jordan's injury did not arise from either the ownership, maintenance, or use of a motor vehicle. Rather, Jordan was injured by the auger, which was not a motor vehicle. Therefore, UM/UIM coverage does not arise pursuant to R.C. 3939.18. Thus, the trial court's grant of summary judgment in favor of CIC was proper, and we need not address whether the trial court's reasoning or CIC's other arguments support the court's grant of summary judgment. Jordan's second assignment of error is without merit and overruled.
Appellant's third assignment of error:
 {¶ 37} Jordan argues that the trial court committed several errors at the trial against CME and in denying Jordan's motion for a new trial. We disagree.
a. The trial court's denial of Jordan's motion for partialsummary judgment and submitting the assumption of the riskdefense to the jury
 {¶ 38} Jordan argues that the trial court erred in allowing the affirmative defense of assumption of the risk to be presented to the jury. We disagree.
 {¶ 39} A plaintiff will be found to have assumed the risk of an unreasonably dangerous condition when (1) he knows of the condition; (2) the condition is patently dangerous; and (3) he voluntarily exposes himself to the condition. Carrel v. AlliedProds. Corp., 78 Ohio St.3d 284, 289, 1997-Ohio-12. However, the Ohio Supreme Court has stated that "an employee does not voluntarily or unreasonably assume the risk of injury which occurs in the course of his or her employment when that risk must be encountered in the normal performance of his or her required job duties and responsibilities." Cremeans v. Willmar HendersonMfg. Co. (1991), 57 Ohio St.3d 145, syllabus; see also Carrel,
supra.
 {¶ 40} In Mercurio v. Nissan Motor Corp. (S.D. Ohio),81 F. Supp.2d 859, 862, the court examined a case where an individual brought a products liability action against an automobile manufacturer alleging a vehicle was not crashworthy. The automobile manufacturer was not permitted to submit evidence of the driver's intoxication based on the defense of assumption of the risk because the court determined that whether the driver was intoxicated was irrelevant to the crashworthiness of the vehicle. Id.
 {¶ 41} CME raised three basis for its assumption of the risk argument: (1) that Jordan himself had shortened the two wobble switches on the mast and absent that shortening they would have shut off the machine, (2) that Jordan kicked the auger while it was rotating in contravention of warnings on the machine, and (3) that Jordan's employment did not require him to be within one foot of the rotating auger and necessarily he had to have been within a foot of the auger in order to become entangled.
 {¶ 42} We note initially that no evidence was presented at trial that Jordan shortened either of the two wobble switches that would have been accessible at the time of the accident. Although there was disputed evidence that Jordan shortened the cathead wobble switch, the cathead wobble switch is irrelevant to this accident as neither Jordan nor his driller's helper, Davidson, could have reached that kill switch to shut the machine down. Further, although there was evidence that Jordan had replaced some kill switches, Jordan specified at trial that the kill switches he replaced were of the mushroom type rather than wobble switches. On the contrary, the evidence presented at trial indicated that the wobble switches on the CME-55 drill rig were shortened prior to Jordan's employment with DTL. Thus, there could be no assumption of risk claim based on the shortened wobble switches.
 {¶ 43} However, there was evidence presented at trial that indicated that Jordan may have kicked the auger while it was rotating or that he was closer to the rotating auger than was necessary for his employment. Specifically, Robert Fuller at trial testified that in the moments immediately preceding the accident, he had observed Jordan kick the rotating auger twice. Additionally, the CME representative, who had over twenty years of experience in drilling, opined that he believed Jordan must have kicked the auger while it was rotating in order to become entangled as he did. CME also presented evidence at trial that kicking a rotating auger was not a necessary part of Jordan's duties for DTL, but rather that he had been specifically warned not to kick the auger while it was rotating. Further, evidence was presented that in performing his duties, Jordan did not have to come within one foot of the rotating auger and that in order to have become entangled he would have had to have been within that distance.
 {¶ 44} Therefore, unlike the situation the Supreme Court discussed in Cremeans, evidence was presented that either kicking the rotating auger or being within one foot of the rotating auger was not a part of Jordan's duties with DTL. Also, unlike Mercurio, the manner in which the accident occurred, possibly through Jordan's action of kicking the auger, was relevant to the allegations that CME had defectively designed that drill rig to allow workers to come too close to the auger. Thus, since kicking the auger or being within one foot of it while it was rotating was not a required part of his employment and was relevant to Jordan's claims against CME, these actions were evidence supporting an assumption of the risk instruction. As a result, we cannot say that the trial court committed reversible error in overruling plaintiffs' motion for partial summary judgment on the affirmative defense of assumption of risk and in giving the jury an instruction on the issue.
b. The trial court's admission over objection of prior badacts and hearsay testimony
 {¶ 45} Jordan argues the trial court committed reversible error by admitting testimony regarding incidents where he had previously kicked spoil off the auger. We disagree.
 {¶ 46} Ohio Rule of Evidence 404(b) provides:
 {¶ 47} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 48} Ohio courts have held that although Evid. R. 404(B) applies equally to civil and criminal cases, it only excludes extrinsic evidence. State v. Renner (1998),125 Ohio App.3d 383; State v. Smith (1990), 49 Ohio St.3d 137, 140; State v.Bogan (Aug. 6, 1998), Cuyahoga App. No. 72278; State v. Jones
(June 29, 2000), Franklin App. No. 99AP-813; State v. Rocker
(Sept. 1, 1998), Franklin App. No. 97APA10-1341. Specifically, Evid. R. 404(B) does not apply if the acts in question are intrinsic, meaning that "the acts are part of the events in question or form part of the immediate background of the alleged act which forms the basis for the [lawsuit]." Bogan, supra citing 3 Jones On Evidence Civil and Criminal, (1992) 328, Section 17:13, State v. Curry (1975), 43 Ohio St.2d 66, 73. Evidence of other acts are admissible if the other act is so connected with the act at issue in the trial that the facts of each are logically intertwined. Rocker, supra; State v. Long
(1989), 64 Ohio App.3d 615, 617.
 {¶ 49} Here, Jordan argues the trial court erred by admitting the testimony of Robert Fuller. Fuller testified at trial that he had observed from 495 feet away Jordan kick the rotating auger on two occasions on the day of the accident — once about 45 minutes before the accident and again about 15 minutes before the accident. Jordan argues that this was evidence of prior bad acts offered to prove Jordan acted in conformity with the prior acts, specifically that he was kicking the auger when his leg became entangled. Jordan argues that this use of prior acts testimony is improper under Evid. R. 404(B) and should not have been allowed by the trial court.
 {¶ 50} However, as we stated above Evid. R. 404(B) only applies to extrinsic evidence. We do not find that Fuller's testimony was extrinsic evidence. As the incidents Fuller claimed to have witnessed occurred only 45 minutes and 15 minutes before Jordan's accident, we cannot say that they are not part of the operative facts of the case. Rather we think Fuller's testimony forms part of the immediate background of the accident in which Jordan lost his leg. As such, Fuller's testimony offered intrinsic rather than extrinsic evidence and Evid. R. 404(B) does not apply. Thus, the trial court did not err in admitting this testimony.
 {¶ 51} Additionally, Jordan argues that the trial court erred in admitting the testimony of Lee, in which he relayed an event wherein he was informed by another employee that Jordan had kicked the auger. Jordan argues that this testimony was admitted despite objections based on hearsay and Evid. R. 404(B).
 {¶ 52} Evid. R. 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." This Court stated in State v. Hirtzinger (1997),124 Ohio App.3d 40, 50 "When a court admits hearsay against the dictates of Evid.R. 802, the standard of review is a strict one. `In the final analysis, the evidence in favor of conviction absent the hearsay must be so overwhelming that the admission of those statements was harmless beyond a reasonable doubt.'" Id. citing State v. Kidder (1987), 32 Ohio St.3d 279, 284.
 {¶ 53} At trial, Lee testified that several months before the accident another employee, Lonnie Burton, had told him that he saw Jordan kick a rotating auger while working out on a job. Further, Lee testified that Burton had stated that he had kicked Jordan in the leg and told him never to do it again. Also, Lee testified that he had called Jordan into his office and had told him not to kick the rotating auger because "it would tear his damn leg off." Tr. 1848-52.
 {¶ 54} CME argues that Lee's testimony was not hearsay because it was not offered for the truth of the matter asserted, specifically that the auger would tear off Jordan's leg. Additionally, CME argues that the testimony was not barred by Evid.R. 404(B) because it was offered to show that Jordan had knowledge that he could be injured by kicking the auger. However, we do not agree. We believe CME elicited the testimony to show that Jordan had a history of kicking the auger and that Jordan had likely kicked the auger at the time of his accident. We find that Lee's testimony was both impermissible hearsay and improper evidence under Evid. R. 404(B). The trial court erred in failing to strike this testimony by Lee.
 {¶ 55} However, CME further argues that if the trial court erred in admitting Lee's testimony, it only amounted to harmless error. We agree. We find that Lee's testimony was harmless in light of Fuller and Jordan's testimony. Jordan admitted at trial that he had on occasion during the course of his three years of employment kicked the rotating auger. This was in addition to Fuller's testimony that Jordan kicked the auger on two occasions shortly before the accident. Lee's testimony that Jordan had once before kicked the auger was merely a repetition of Jordan's own testimony that he had on occasion kicked the auger. Further, Lee's testimony was not nearly as detrimental to Jordan's case as Fuller's testimony that Jordan was kicking the auger on the day of the accident. Therefore, we find that any error the trial court committed in admitting Lee's testimony was harmless.
c. The trial court's denial of Jordan's motion for a new trialupon internally inconsistent jury interrogatories
 {¶ 56} Jordan asserts that a new trial is warranted because the interrogatories completed by the jury at the trial although consistent with each individual verdict corresponding to the interrogatory were inconsistent between themselves. We disagree.
 {¶ 57} In Phillips v. Dayton Power Light (1996),111 Ohio App.3d 433, 447, this Court stated that Civ.R. 49 applies equally to internally inconsistent jury interrogatories as to interrogatory answers inconsistent with the general verdict. Further, this Court said, "a trial court may send a jury back to reconsider answers to interrogatories which are insufficient, incomplete, or contradictory or show a misconception of the question," or order a new trial in the alternative. Id. at 447-448.
 {¶ 58} The duty to provide adequate warnings is the same for the negligent failure to warn and strict product liability failure to warn. Crislip v. TCH Liquidating Co., (1990)52 Ohio St.3d 251, syllabus. Further, the same standard of conduct is required of the manufacturer in both a strict liability and a negligence in defective design products liability claim, specifically to exercise reasonable care in the design of the product. Jones v. White Motor Corp. (1978), 61 Ohio App.2d 162, syllabus.
 {¶ 59} The following interrogatories were returned by the jury:
 {¶ 60} "Count one
 {¶ 61} "Common law strict liability design defect theory
 {¶ 62} "Interrogatory A
 {¶ 63} "Have you found by a preponderance of the evidence that the CME drill rig was defective in design under the Common Law Strict Liability Design Defect Theory?
 {¶ 64} "Yes X No
 {¶ 65} "* * *
 {¶ 66} "Count Two
 {¶ 67} "Common law strict liability warnings theory
 {¶ 68} "Interrogatory A
 {¶ 69} "Have you found, by a preponderance of the evidence, that CME failed to provide adequate warnings of the risks associated with the reasonably foreseeable uses and misuses associated with the CME drill rig under the Common Law Strict Liability Warnings theory?
 {¶ 70} "Yes X No
 {¶ 71} "* * *
 {¶ 72} "Count Three
 {¶ 73} "Statutory strict liability design defect theory
 {¶ 74} "Interrogatory A
 {¶ 75} "Have you found, by a preponderance of the evidence, that the CME drill rig was defective in design under the Statutory Strict Liability Design Defect Theory?
 {¶ 76} "Yes X No
 {¶ 77} "* * *
 {¶ 78} "Count Four
 {¶ 79} "Statutory strict liability warnings theory
 {¶ 80} "Interrogatory A
 {¶ 81} "Have you found, by a preponderance of the evidence, that CME failed to provide adequate warnings of the risks associated with the reasonably foreseeable uses and misuses associated with the CME drill rig under the Common Law Strict Liability Warnings theory?
1. "Yes X No
 {¶ 82} "* * *
 {¶ 83} "Count Five
 {¶ 84} "Common law negligence theory
 {¶ 85} "Interrogatory A
 {¶ 86} "Have you found, by a preponderance of the evidence, that CME negligently designed the CME drill rig or that CME negligently failed to provide adequate warnings of the risks associated with the reasonably foreseeable uses and misuses associated with the CME drill rig under the Common Law Negligence theory?
1. "X Yes No
 {¶ 87} "* * *
 {¶ 88} "If `yes,' please go to interrogatory B
 {¶ 89} "INTERROGATORY B
 {¶ 90} "Have you found, by a preponderance of the evidence, that the negligence of CME was a proximate cause of the plaintiffs' injuries?
1. "Yes X No
 {¶ 91} "* * *."
 {¶ 92} In the first four counts, the interrogatory instruction stated that if the jury had answered "no", then the jury should sign the verdict form for the Defendant and move on to the next count. However, the jury failed to follow this instruction and instead continued to answer other interrogatories within the same count. In these interrogatories, the jury indicated that it did not find that either the defective design or the failure to provide adequate warnings was a proximate cause of Jordan's injuries. Moreover, in these additional interrogatories that the jury elected to answer, it indicated that CME had established the affirmative defense of assumption of the risk and that "the affirmative defense of assumption of the risk was a proximate cause of the plaintiffs' injuries". The jury also completed the verdict forms all in favor of CME.
 {¶ 93} Jordan argues that the interrogatories are internally inconsistent because on count five, the jury found CME was negligent in either its design of the drill rig or in its failure to provide adequate warnings, and yet in counts one through four the jury determined that under either a common law or a strict liability theory, the CME-55 drill rig was neither defective in design nor had CME failed to provide adequate warnings. As the duty or standard is the same for both negligent and strict liability defective design and failure to warn, Jordan argues these interrogatories are internally inconsistent.
 {¶ 94} CME argues that any error the jury may have committed in failing to determine that CME either defectively designed or failed to adequately warn Jordan under a strict liability theory was harmless. CME argues that even if the jury would have checked "yes" to the first interrogatory on counts one through four, the verdict on those counts would still have remained for the defense because the jury indicated that it had also found that any defective design or failure to warn was not a proximate cause of Jordan's injuries and that Jordan assumed the risk and this assumption was a proximate cause of his injuries. We agree. Despite the jury's answer to the first interrogatory in counts one through four, the verdict on those counts remains for CME because the jury did not find CME proximately caused Jordan injuries and found the affirmative defense of assumption of risk. Therefore, we do not find any inconsistency in the jury's verdicts and interrogatories, and the trial court did not err in overruling Jordan's motion for a new trial.
d. The trial court's failure to remove DTL from the caption ofan interrogatory
 {¶ 95} Jordan argues that reversible error occurred when the trial court inadvertently left DTL's name rather than CME's name in the caption of an interrogatory. We disagree.
 {¶ 96} The Ohio Supreme Court noted in Eberly v. A-PControls, Inc. (1991), 61 Ohio St.3d 27, that naming a non-party on an interrogatory can necessitate a new trial. Eberly
involved a lawsuit for the wrongful death of a man who was killed at his workplace. Id. The Eberly plaintiff sued the employer and the designer and manufacturer of the device that resulted in the death. Id. In Eberly, the intentional tort complaint against the employer was dismissed but the case proceeded to trial against the designer and manufacturer. Id. In the interrogatories, the jury was asked to determine whether the several parties were negligent and to assign a percentage to each of the parties for their negligence that had proximately caused the death. Id. The court left the dismissed employer in the interrogatories, resulting in the jury assigning some negligence and a proximate cause percentage to the non-party employer. Id. The Ohio Supreme Court found that this was error and ordered a new trial. Id.
 {¶ 97} However, we stated in Waldron v. Miami ValleyHospital (Dec. 7, 1994), Montgomery App. No. 14108, unreported, that Eberly has little application outside of a case in which the issue of comparative negligence was before the jury.
 {¶ 98} At trial, the court inadvertently left DTL on the caption of one of the interrogatories rather than CME. The jury questioned this and the trial court informed the jury that this was an error and that DTL had been part of the action but had been previously dismissed by the court. Jordan argues that the jury concluded from the DTL's former involvement in the case that Jordan had received a substantial settlement from DTL, and therefore, the jury returned a general verdict for CME.
 {¶ 99} We find that any error from the trial court's inadvertent mistake was harmless. The error was merely typographical, and the court gave a corrective instruction to the jury. Although Jordan argues that the jury may have inferred that Jordan had received a substantial settlement from DTL, we find it is more likely that the jury recognized this as simply an inadvertent mistake. Thus, any error as a result of the court inadvertently leaving DTL in the caption of one interrogatory was harmless error and does not necessitate a new trial.
e. Defense counsel's conduct at trial
 {¶ 100} Finally, Jordan argues that the trial court permitted CME's counsel to engage in several incidents of intentional misrepresentation, concealment, and falsification and that this conduct resulted in the deprivation of Jordan's right to a fair trial. We disagree.
 {¶ 101} A trial court is granted broad discretion in determining whether or not to grant a motion for a new trial.Bell v. Mt. Sinai Med. Ctr. (1994), 95 Ohio App.3d 590, 595. An order denying a motion for a new trial will only be reversed upon a showing of an abuse of discretion. Id. An abuse of discretion amounts to more than a mere error of law or judgment but implies an attitude on behalf of the court that was unreasonable, arbitrary, or unconscionable. Id. Moreover, if a new trial is sought due to misconduct on the part of counsel, a trial court's denial of the motion for a new trial should only be reversed if the alleged misconduct damaged the opposing party and prevented a fair trial. Cook v. Akron General Med. Ctr. (1993),86 Ohio App.3d 196, 198.
 {¶ 102} Jordan argues that counsel for CME used inappropriate comments throughout the trial and prior to trial intentionally misrepresented the length of the wobble switches. Jordan concedes that the trial court granted him a continuance, however he argues the brief continuance was insufficient to remedy the situation. Regarding the wobble switches, Jordan argues defense counsel misled and concealed from plaintiffs' counsel the length, purpose, and details about the safety of the wobble switches. Specifically, Jordan claims that CME's trial counsel concealed and misrepresented that the length of the wobble switches were eighteen inches on some drill rigs. We do not believe that Jordan was denied his right to a fair trial as a result of his late discovery that some CME drill rigs contained eighteen inch wands. Rather, Jordan received a continuance of the trial that cured this discovery error.
 {¶ 103} In reference to improper comments by defense counsel, Jordan points to comments by defense trial counsel in the closing argument in which he stated that plaintiffs' counsel had abused one of the defense witnesses, stating that the questioning had been "wanton and without justification". Further, Jordan alleges that defense counsel repeatedly improperly resorted to an "empty chair" defense by implying that DTL was the party who caused Jordan's injuries.
 {¶ 104} Having reviewed the trial transcript, we cannot agree that defense counsel's conduct harmed Jordan and prevented him from receiving a fair trial. As such, we cannot find that the trial court's denial of Jordan's motion for a new trial was unreasonable, arbitrary, or unconscionable. Thus, we do not find the trial court committed reversible error in denying Jordan's motion for a new trial.
 {¶ 105} Jordan's third assignment of error is without merit and is overruled.
Appellant's fourth assignment of error:
 {¶ 106} Jordan argues that the jury's verdict in favor of CME was against the manifest weight of the evidence. We disagree.
 {¶ 107} When reviewing a trial court's judgment under a manifest weight standard of review, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus;Seasons Coal, Co., Inc. v. City of Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 108} CME presented evidence that the wobble safety switch design on the drill rig and its warning were neither negligent nor a proximate cause of Jordan's injuries. At trial, CME demonstrated that the drill rig on which Jordan worked was delivered to DTL with wobble switches of the proper length but that by the time of the accident the wobble switches had been cut shorter. Also, CME presented expert testimony by Professor Barnett that if the wobble switches had not been shortened that Jordan would have inadvertently hit the wobble switches when he was being drug into the auger, thereby preventing his injuries. Moreover, CME presented evidence that Jordan was seen kicking spoil off the auger in the moments before his injury, which warning labels on the drill rig specifically stated should be removed only by a long handled shovel. Additionally, CME established that kicking spoil from the auger was not part of Jordan's job duties. Thus, CME presented competent, credible evidence that Jordan had assumed the risk by kicking the spoil off the auger.
 {¶ 109} Further, CME presented evidence that the safety wobble switches were the best possible design for the drill rig. Although Jordan presented experts who opined that other safety devices should have been implemented such as a device that required the operator to remain on the platform in order for the auger to rotate, CME presented experts who opined as to why these devices would not be effective and how they would not prevent an injury of Jordan's type. Also, even though Jordan's experts opined that the wobble switches should have been longer, placed in a different location on the machine, or have been more numerous, CME's expert, Barnett, testified that the safety wobble switches as they were when installed would have prevented Jordan's injury had they not been shortened. Thus, Barnett opined that there was no need for additional switches, longer switches, or different placement of the switches. Therefore, CME presented competent, credible evidence that no better alternative designs existed.
 {¶ 110} Thus, competent, credible evidence was presented at trial that supported the jury's verdict that neither CME's design nor its warnings or lack thereof were negligent or the proximate cause of Jordan's injuries. Having reviewed the transcript, the jury's verdict for CME was not against the manifest weight of the evidence. Jordan's fourth assignment of error is without merit and overruled.
 {¶ 111} The judgment of the trial court is affirmed in part, reversed in part, and the matter is remanded for further proceedings consistent with this court's opinion.
FAIN, P.J. and GRADY, J., concur.