OPINION
{¶ 1} Ana Anguiano appeals from a judgment of the Darke County Court of Common Pleas which granted the motion of Honeywell International, Inc. ("Honeywell"), for summary judgment on her employer intentional tort claim.
 {¶ 2} On July 19, 1999, Ana Anguiano was assigned to work near the carton-taping machine portion of the conveyor system, which had recently been reconfigured and repositioned to a different part of the plant. Anguiano had previously worked along the conveyor but not at that location and not in the configuration that existed in July 1999.
 {¶ 3} On the day of the accident, Anguiano's duties involved manually packing six oil filters into a cardboard box and placing the box onto a carton-taping machine. She had also been instructed to remove boxes that were improperly taped together due to malfunctions of the taping machine. As Anguiano was attempting to remove boxes from the conveyor line, her left hand became caught (palm down) between a transfer roller and the shipping conveyor belt. The conveyor pulled part of Anguiano's forearm into the conveyor. Douglas Kolling, team leader of the heavy-duty assembly, witnessed the accident, leapt over the conveyor, and pressed the emergency stop button. As a result of the accident, Anguiano suffered serious and permanent injury to her hand. Honeywell subsequently installed a light curtain, which would cut power to the conveyor when an object entered its beam.
 {¶ 4} On April 3, 2003, Anguiano initiated this litigation against Honeywell, alleging an employer intentional tort claim. (In her complaint, Anguiano named Honeywell; Honeywell, Inc.; and AlliedSignal, Inc. as defendants. In its answer, Honeywell admitted that it is the successor-in-interest to AlliedSignal. It has further acknowledged that it is also known as Honeywell, Inc.). Anguiano's husband also brought a claim for loss of consortium. Honeywell subsequently filed a motion for summary judgment on the employer intentional tort claim, which the trial court granted.
 {¶ 5} Anguiano asserts one assignment of error on appeal.
 {¶ 6} "The trial court erred to the prejudice of the plaintiff-appellant in sustaining appellee[']s motion for summary judgment."
 {¶ 7} Anguiano claims that summary judgment was inappropriate, because she can establish each of the elements of an employer intentional tort claim.
 {¶ 8} Our review of the trial court's decision to grant summary judgment is de novo. See Helton v. Scioto Cty. Bd. ofCommrs. (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See Stateex rel. Grady v. State Emp. Relations Bd., 78 Ohio St.3d 181,183, 1997-Ohio-221, 677 N.E.2d 343; Harless v. Willis DayWarehousing Co. (1978), 54 Ohio St.2d 64, 65-66, 8 O.O.3d 73,375 N.E.2d 46.
 {¶ 9} In general, Ohio's worker's compensation law governs the relationship between employers and employees with respect to injuries occurring in the workplace. Under that law, employers generally are immune from liability to an employee who is injured during the course of her employment, and the injured employee is limited to redress through the workers' compensation scheme. Where an employee's injury results from the employer's intentional tort, however, the Workers' Compensation Act permits the employee to file a suit for damages against the employer. SeeFyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115,570 N.E.2d 1108.
 {¶ 10} In order to establish an employer intentional tort claim, the employee must demonstrate: (1) that the employer had knowledge of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) that the employer had knowledge "that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty;" and (3) "that the employer under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe,
supra, at paragraph one of the syllabus; Jordan v. DaytonTesting Laboratories, Inc., Montgomery App. No. 19741, 2004-Ohio-2425.
 {¶ 11} The supreme court has clarified that an employer intentional tort claim requires proof beyond that required to establish negligence or recklessness:
 {¶ 12} "Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Fyffe,59 Ohio St.3d 115, at paragraph two of the syllabus. Consequently, this is an exceedingly difficult test to satisfy. "The intentional tort cause of action is limited to egregious cases." Sanek v.Duracote, Inc. (1989), 43 Ohio St. 3d 169, 172, 539 N.E.2d 1114.
 {¶ 13} In addressing Honeywell's motion, the trial court followed the tripartite test for establishing an employer intentional tort claim as set forth in Fyffe. The court first concluded that the evidence demonstrated that the nip point between the two conveyor systems was a dangerous condition. Addressing the second and third prongs together, the court concluded that Anguiano had not satisfied these elements. It reasoned that "[t]he remediation efforts and compliance with safety regulations clearly demonstrate that Honeywell did not knowingly act to require Ana Anguiano to perform a dangerous task. There is no proof that this equipment in its condition on July 19, 1999 was substantially likely to cause injury."
 {¶ 14} Anguiano claims that the trial court erred in concluding that her injury was not substantially certain to occur. As an initial matter, she contends that the trial court relied upon evidence that was not contained in the record. Specifically, she asserts that Honeywell did not present evidence that OSHA had investigated her accident and had determined that the company's conduct did not necessitate a citation. Anguiano argues that the trial court thus erroneously concluded that "Honeywell's remedial action was satisfactory to OSHA and in compliance with the Ohio Administrative Code such that the Bureau of Worker's Compensation found that Honeywell did not violate any specific safety regulation."
 {¶ 15} According to the Industrial Commission of Ohio Record of Proceeding, the Ohio Bureau of Workers' Compensation Safety Violations Investigation Unit ("the Bureau") conducted an investigation of Anguiano's accident on July 20, 1999. Relying upon that investigation report as well as other evidence presented at the hearing, the Staff Hearing Officer concluded that Honeywell had complied with Ohio Admin. Code4121:1-5-05(C)(2) (4) by installing the "stop button box." (On January 10, 2004, i.e., after the trial court had ruled on the summary judgment motion, the Industrial Commission declined to rehear the merits of Anguiano's VSSR application.) Accordingly, the trial court had evidence that Honeywell had not violated state safety regulations. Although there is no evidence that OSHA had also investigated the accident, Timothy Collette, Honeywell's Manager of Health, Safety, and Environmental, indicated in his affidavit that no OSHA citation was issued as a result of Anguiano's accident. Because the trial court had evidence of Honeywell's compliance with Ohio safety regulations and there is no evidence of OSHA violations, the trial court's reference to OSHA's satisfaction with the remedial measures was erroneous but harmless.
 {¶ 16} In support of her employer intentional tort claim, Anguiano relies primarily on the fact that another employee, Deb Kolling, was involved in a similar accident at the same pinch point on July 2, 1999. According to the accident report, Kolling was attempting to remove boxes that had been improperly taped together by the cartontaping machine. As Kolling attempted to pick them up, the boxes fell on their side. Kolling reached under the boxes with her right hand (palm up), which then became caught between the conveyor belt and the dead roller. The report noted that the taping machine was very close to the end of the conveyor, and that the failure of the machine to properly cut the tape on each box resulted in employees needing to cut and separate the boxes or to remove them from the conveyor to repair them. The report further stated that the emergency stop did not immediately stop the conveyor once activated; rather, the belt would coast for approximately 3 1/2 feet. Under the section for corrective action, the report stated:
 {¶ 17} "Removed immediately (1) dead roller to open up and lessen pinch point."
 {¶ 18} "Instructed all person[n]el to shut off conv[e]yor and line if necessary to perform duties safe[ly]."
 {¶ 19} "Work order submitted to lower convayer [sic] approx. 4 inch and remove remaining dead roller. Then extend convayer [sic] approx. 4 inches thereby eliminating pinch point."
 {¶ 20} "Investigation also uncovered an additional hazard at drive roller and side guard — there is a open spot which would allow a hand to become caught under belt into drive roller. Contacted maint. G/L and corrected immediately."
 {¶ 21} Work Order #12336 was submitted on July 13, 1999. The order instructed maintenance to "cut small slot in end of guide roller bracket at end of collector belt where cartons are transferred to shipping belt, per Frank Baker/Tim Collette discussion. Also install electrical E-stop directly across from end of belt."
 {¶ 22} Anguiano's expert, Bartley J. Eckhardt, stated in his affidavit that the corrective actions that were suggested in the Deb Kolling accident report would have likely eliminated the nip point. He further opined that the changes that were actually made after the July 2, 1999, accident, which were not in accordance with the accident report, "were of a perfunctory nature, and failed to eliminate a nip point between the Transfer and Shipping Conveyors; the changes made still left an unguarded nip point." Eckhardt indicated that the changes "could not have been reasonably expected to prevent additional injury; it is further my opinion that other higher methods of protecting employees from this nip point were readily available as is reflected by the Defendant's action of installing a light curtain (i.e. an electronic eye) to prevent access to the nip point while the conveyor is in motion after the injury to Ana Anguiano."
 {¶ 23} Anguiano argues that Honeywell took no actions to ensure that its alleged remedial measures would be effective. She points to Collette's deposition testimony, in which he indicated that he had tested the notched roller, but the conveyor was not running at the time. Others had also tested the modified roller bracket, but Collette "guess[ed] that it wasn't running."
 {¶ 24} Anguiano also stated in her affidavit that Honeywell did not warn her about any pinch points or other areas of danger and that it did not inform her of prior problems involving pinch points, including the injury to Deb Kolling. Anguiano indicated that she also was not made aware of the location of the stop button. Kathy Gasson likewise stated in her deposition that, before Anguiano's accident, she had never been infoed of the location or operation of any stop buttons. (Gasson was located on the opposite side of the conveyor from Anguiano at the time of her accident.) Anguiano comments that, even if she had been made aware of the stop button's location, it was placed approximately two feet to the left of the pinch point and, due to her left arm being pulled into the conveyor, she would not have been able to reach it with either hand.
 {¶ 25} Anguiano further emphasizes that, even with these alleged corrective measures, the pinch point remained unguarded, the layout and the design of the workspace was not modified after the Kolling accident, and Honeywell could have taken effective corrective action, as demonstrated by the fact that it installed a light curtain after Anguiano's accident.
 {¶ 26} Honeywell responds that the facts that they (1) attempted a corrective action and (2) complied with safety regulations are dispositive of Anguiano's claim. Honeywell points to evidence that subsequent to Kolling's accident and prior to Anguiano's accident, "[a] slot was cut into the end of the conveyor's roller bracket to permit the involved roller to `pop out' if necessary. Also, an emergency stop button was installed within 24 inches of the end of the belt." Collette indicated that the button "was within easy reach" of Anguiano's hand during and after her accident. Honeywell claims that by making these remedial measures, it believed that it had eliminated the possibility of another injury. Thus, Honeywell argues that its actions cannot rise to the level of intentional conduct, as a matter of law. Citing the decisions of the Industrial Commission, Honeywell further notes that the safety improvements met the safety standards of OSHA and of the Ohio Administrative Code.
 {¶ 27} Beginning with the first Fyffe requirement, we agree with the trial court that the conveyor constituted a dangerous condition or instrumentality. It is undisputed that Deb Kolling had been injured at the same pinch point which caused Anguiano's injury. The record is clear that Anguiano's injury occurred less than three weeks after Kolling's accident, and that the conveyor still had an unguarded pinch point at that location. Honeywell required employees to remove boxes from the conveyor that were improperly taped by the taping machine, the machine was very close to the end of the conveyor, and Honeywell was aware that the boxes were heavy and could be difficult to remove from the conveyor. The corrective action taken by Honeywell apparently was intended to allow the roller to "pop out" after an employee's hand had gotten caught in the conveyor. Accordingly, the court properly found that there was evidence to support the firstFyffe element.
 {¶ 28} Anguiano has also presented evidence to create a genuine issue of material fact that she was required to perform the dangerous task, as the third element of the Fyffe test requires. As stated above, Anguiano stated that the taping machine would often mis-tape the boxes, and the boxes would become jammed along the conveyor. She stated that, when this occurred, she was required to remove the boxes from the transfer conveyor. Gasson likewise stated that Anguiano had been required to remove jammed or mis-taped boxes from the conveyor. Anguiano was injured while performing this task.
 {¶ 29} The pivotal issue is whether Honeywell had knowledge that if Anguiano were subjected to that dangerous instrumentality or condition, then she would be harmed in some manner similar to the injury that she sustained or that it was substantially certain that she would be harmed in some manner similar to her injury (i.e., the second prong of the Fyffe test). We agree with Anguiano that the decision of the Ohio Industrial Commission is not dispositive. Although the court may consider an employer's compliance or lack of compliance with safety standards, a trier of fact may decide the weight to give such evidence in light of the other evidence presented. See Miko v. Delphi Chassis,
Montgomery App. No. 18940, 2002-Ohio-280 ("a violation of a safety regulation does not, in itself, establish that injury was a substantial certainty."); Maddox v. L.O. Warner, Inc. (Feb. 7, 1996), Montgomery App. No. 15468 ("OSHA violations are only one of many factors to be taken into consideration in determining whether harm was substantially certain to occur."). In the present case, Collette informed the Industrial Commission that a safety button had been installed two feet away from the center of the conveyor. The Bureau's investigation also apparently revealed that the stop button box had been mounted on the framework of the transfer conveyor. However, nothing in the Record of Proceedings indicates whether the stop button stopped the conveyor immediately or if the investigators had explored whether the stop button had a delay. Anguiano has presented evidence that, at the time of Kolling's accident, the stop button did not immediately stop the conveyor. See Moebius v. General Motors Corp.,
Montgomery App. No. 19147, 2002-Ohio-3918 (finding a genuine issue of material fact remained as to whether the plaintiff's injury was substantially certain to occur when the employer inserted a five second delay on the kill switch, unbeknownst to the employee). Collette testified that, after Kolling's accident, the stop was merely moved to its present location. Because the Bureau's investigation did not state that the stop button immediately stopped the conveyor and because Anguiano has presented uncontroverted evidence to the contrary, the trial court could have attached lesser weight to the lack of safety violations.
 {¶ 30} Although the lack of safety violations is not dispositive, we conclude that, when construing the evidence in the light most favorable to Anguiano, Honeywell's conduct does not rise to the level of an intentional tort. It is undisputed that Collette was aware of the recommendations for modifying the conveyor system after Kolling's accident and chose not to employ them. However, it is likewise undisputed that Honeywell attempted to take some corrective action. Specifically, Honeywell opted to notch out the roller bracket so that the roller would "pop out" if anything got caught and put pressure on the roller. Collette explained:
 {¶ 31} "We evaluated the accident that happened to Deb Kolling and we took measures that we believed at the time would correct the problem. We care about our employees and evaluated the incident and, you know, did the best we could to prevent injury from happening. We are sorry it happened the second time, but we did take measures to address, and I'm pointing to Exhibit 8, to address those two rollers that were part of the initial injury with Ms. Deb. Kolling."
 {¶ 32} He continued: "We thought that, you know, by notching those brackets out, if someone's finger or anything got caught in there, it would have eliminated the possibility of another injury happening. We looked at it and evaluated, saying okay, how can we prevent another injury, and that was the best, you know, at the time, what we thought would eliminate that pinch point." Collette stated that any force would cause the roller to come out.
 {¶ 33} The fact that Honeywell chose not to employ the recommendations from the accident report does not raise Honeywell's conduct to an intentional tort, absent evidence that it knew that its actions would have no effect on the risk of injury to its employees. "An employer can fail to take corrective action, [to] institute safety measures, or [to] properly warn the employees of the risks involved, and still not be liable for an intentional tort." Tipton v. Bernie's Elec. Sales Serv.,
2003-Ohio-1629, at ¶ 27, citing Van Fossen v. Babcock WilcoxCo. (1988), 36 Ohio St.3d 100, 117, 522 N.E.2d 489. In our judgment, the fact that Honeywell attempted to avoid another injury by modifying the roller, rather than making the more expansive modifications to the conveyor system as a whole, sounds of negligence or recklessness but not intentional conduct.
 {¶ 34} Anguiano emphasizes that her expert has opined that the changes made to the conveyor system were "perfunctory" and "could not have been reasonably expected to prevent additional injury." She further asserts that it is unclear whether Honeywell tested the modified roller under actual working conditions. As noted by Anguiano, Collette testified:
 {¶ 35} A: "It was tested by a few employees, more than likely, if I remember correctly, the employees that were involved with this, who notched, I'm pointing to [Plaintiff's Exhibit] number 8, the two rollers, tried it a few times."
 {¶ 36} Q: "Did he try it with the conveyor belt running such as a normal business environment?"
 {¶ 37} A: "I do not know."
 {¶ 38} Q: "Who was this employee that tested it?"
 {¶ 39} A: "I don't remember."
 {¶ 40} Q: "Were you present when the machine was tested?"
 {¶ 41} A: "I was out there a variety of times, I actually pulled it up myself one time."
 {¶ 42} Q: "Was the conveyor belt running at that time?"
 {¶ 43} A: "It was not when I tried it. I'm not sure about the other times."
 {¶ 44} Q: "Fair to say when you did it, you stuck your hand in there and popped the roller out, but that was not in normal working conditions?"
 {¶ 45} A: "Looking at the time frame, my guess is, and I'm speculating, July is usually our shut down period, so I'm guessing that it wasn't running, we have no production then, the first couple weeks, so I'm guessing it was possibly a day before our shut down here, I'm just speculating, but I know I did not have the conveyor running when I tried it."
 {¶ 46} Even if Honeywell had failed to test the altered roller bracket with the conveyor in motion, such conduct does not rise to the level of an intentional tort. At best, Honeywell was reckless in failing to ensure that the roller would pop out of the bracket when force was applied during actual working conditions. In our judgment, in light of Honeywell's attempts (albeit failed attempts) to avoid a subsequent accident, the court properly concluded that there was no genuine issue of material fact that Honeywell knew that Anguiano's injury was substantially certain to occur.
 {¶ 47} The assignment of error is overruled.
 {¶ 48} The judgment of the trial court is affirmed.
Brogan, J. and Grady, J., concur.